UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     -v.-

DAVID ZAYAS,

               Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _11/7/2022_

22-CR-178 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

       The Government charged Defendant David Zayas ("Defendant") with a two count

indictment for possession of crack cocaine with intent to distribute in violation of 21 U.S.C. §

841(a)(1) and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18

U.S.C. § 924(c)(1)(A)(i).  (ECF No. 5.)  By motion noticed on August 15, 2022, Defendant seeks,

on the papers submitted, suppression of the narcotics, handguns, ammunition, and cash recovered

from his vehicle and digital evidence recovered from his two phones in connection with

Defendant's March 10, 2022 traffic stop and arrest.  (ECF No. 15).  Alternatively, Defendant asks

the Court to set an evidentiary hearing (i) to determine whether law enforcement officers had

sufficient cause to justify Defendant's traffic stop on March 10, 2022 based on his purported traffic

violation and information collected by a Westchester County Department of Public Safety

("WCPD") narcotics investigation; (ii) to determine whether law enforcement had reasonable

suspicion to extend the traffic stop and conduct a K-9 search; and (iii) to determine whether law

enforcement had probable cause to search inside his vehicle on the basis of the K-9's positive

narcotics alert.  Defendant also asks the Court to compel discovery on the K-9's training, field

performance, and instances of false positives, and to also set a *Franks* hearing to challenge the

search warrant on his phones ("Subject Devices Warrant" or "Warrant"), which was issued by Magistrate Judge Andrew E. Krause after his arrest.

For the following reasons, the Court GRANTS: (i) an evidentiary hearing to determine whether Defendant committed a traffic violation, thereby justifying his stop; and (ii) Defendant's request for discovery on the K-9's training, field performance, and instances of false positives, which will allow Defendant to contest the K-9's reliability, and therefore, challenge whether law enforcement had probable cause to search inside his vehicle.

The Court DENIES (i) a hearing to allow Defendant to challenge facts gathered in the WCPD's investigation through the adversarial process; (ii) a hearing to determine whether law enforcement had reasonable suspicion to extend the traffic stop; (iii) a probable cause hearing to determine whether the K-9 who search Defendant's car is reliable, given that discovery is still needed on this issue; and (iv) a *Franks* hearing on the Subject Devices Warrant.

## BACKGROUND

The following facts are drawn from the criminal complaint filed in this matter ("Complaint") (ECF No. 1), the indictment (ECF No. 5), and the parties' submissions.

### The WCPD Narcotics Investigation[1]

The WCPD has been conducting an investigation of narcotics traffickers who use the highways of Westchester County to transport drugs from New York City to New England.  (ECF No. 18 ("Govt's Opp.") at 1.) As part of the investigation, Sgt. Kyle McCarrick of WCPD's Intelligence Unit and Real Time Crime Center ("RTC") identifies subject vehicles through, among other means, analysis of license plate reader ("LPR") data and criminal history reports on vehicle

---

[1]     The Government does not offer any affidavits detailing the information in this section, but rather, states that the information is drawn from the Complaint, documents produced in discovery, and interviews with WCPD officers. (ECF No. 18 at 1 n.1.)

owners. (*Id*.)   RTC then relays the information to WCPD officers who patrol the highways, including WCPD's Conditions Unit, which conducts interdiction.  (*Id*.)

Defendant's vehicle, a 2020 gray Chevrolet Equinox bearing a Massachusetts license plate (the "Gray Equinox") had been identified as a subject vehicle as part of the investigation as exhibiting patterns of narcotics trafficking.  (*Id*. at 2.)  The investigation identified at least nine trips from Massachusetts to New York City between August 2020 and March 2022. (*Id*.)  Though complete roundtrip data was not available for each trip, some trips were noted to have a turnaround time of less than an hour from the time the vehicle was detected heading southbound to the time it was detected northbound.  (*Id*.)  In addition, according to service history records, the Gray Equinox averaged approximately 30,000 miles per year, which WCPD determined is more than double the average for personal cars driven in the United States.  (*Id*.)

Prior to stopping the Gray Equinox, WPCD learned that the car was owned by Defendant, who had a prior felony conviction in Massachusetts for drug trafficking, as well as prior arrests for drug trafficking and assault and battery with a weapon.  (*Id*.)  Defendant's previous car was sold to another individual who had multiple prior convictions for narcotics offenses.  (*Id*.)

***The March 10, 2022 Car Stop***

On the afternoon of March 10, 2022, WCPD Officer DiRienzo stopped Defendant around Yonkers, NY while he was patrolling the Cross County Parkway.  (ECF No.1 ("Complaint") ¶ 5a.).  Defendant was driving in the Gray Equinox, and was observed having changed lanes twice without signaling, illegally passing on the right twice, and driving 15 to 20 miles above the speed limit. *(Id*.)  Prior to the stop, Officer DiRienzo had been alerted by the RTC that the Gray Equinox was traveling southbound on the Hutchinson River Parkway in Scarsdale, NY, and that the vehicle

3

was part of the WPCD investigation as exhibiting patterns indicative of narcotics trafficking.  (ECF No. 16, Def.'s Exh. B ("Police Report").)

Officer DiReinzo signaled for the vehicle to pull over, which it did.   (Complaint ¶ 5a.) Officer DiRienzo activated is body-worn camera. (*See* Govt.'s Exh. 1 ("Footage").)   Officer DiRienzo then walked over to Defendant's vehicle and asked for Defendant's license and registration, which Defendant provided.   (*Id*. ¶ 5b). At Officer DiRienzo's request, Defendant stepped out of the car and spoke to Officer DiRienzo on the side of the highway.  Officer DiRienzo asked where Defendant was headed, to which Defendant responded that he was going to see his aunt in the hospital.  (*Id*.)  Defendant was unsure about the name of the hospital, and then stated "Uhhhhhh Lincoln Hospital. Lincoln." (Footage at 2:42.)   Officer DiRienzo asked, "Where's Lincoln Hospital? That's not in Yonkers, right?", to which Defendant responded "Uhhh. I believe so, I'm not really sure, uhh," and then said, "Definitely in the Bronx." (*Id*. at 3:56.)  He added, "I don't know exactly where. I check my GPS." (*Id*. at 3:57.)

Officer DiRienzo asked Defendant questions about his life in Massachusetts, and in the meanwhile, another officer walked around the Gray Equinox and looked through the windows. (Footage at 3:00–45).   After around four minutes since the onset of the traffic stop, Officer DiRienzo told Defendant, "as long as your license is valid, I'm not going to give you a ticket, I think that's reasonable." (Footage at 4:13–23.)  Officer DiRienzo instructed Defendant to remain outside of the vehicle and wait alongside the other officer while he returned to his patrol car.  After around six to seven minutes, Officer DiRienzo returned to Defendant and asked about his license plate and vehicle ownership.  (*Id*. at 10:24–11:15.)  Officer DiRienzo circled over to the front of the Gray Equinox and checked the vehicle identification number.  (*Id*. at 11:15–11:35.)  Officer DiRienzo then walked back to Defendant and stated that in addition to cracking down on traffic

issues, his unit also investigates illegal businesses, and then proceeded to asking Defendant whether he carried any contraband in the vehicle.  (Footage at 11:36–12:50.)  Defendant denied having any contraband in the vehicle.  (*Id*. at 11:35–12:50.).  Officer DiRienzo then asked Defendant if he had his permission to search Defendant's car "bumper to bumper including everything inside of it."  (Footage at 12:50–54).  Defendant asked "[w]hy do you want to search my car" and stated that "I thought this was a traffic stop" to which Officer DiRienzo responded that this was part of the unit's narcotics investigation.  Defendant stated "do what you have to do" and "It's not going to go any other way."  (*Id*. at 12:53–13:25.)  Officer DiRienzo indicated in his Police Report that "[d]ue to his response, I didn't feel it was sufficient for consent."  (Police Report at 3.)

Officer DiRienzo, who was traveling with a trained police dog (the "K-9" or "Liberty"), brought the K-9 over to the Gray Equinox. The K-9 sniffed the outside of the car and alerted to the presence of narcotics.  (Complaint ¶ 5c.)  Officer DiRienzo then retrieved a scope camera from the police vehicle and maneuvered it inside the cabin of the Gray Equinox.  Officer DiRienzo noticed a secret compartment under the dashboard which contained a large amount of cash and what appeared to be narcotics.  (*Id*. ¶ 5d.)  Soon after, an officer accessed Defendant's second phone, which was on the dashboard and set on a navigation application, and found that Defendant was heading to an address in the Washington Heights neighborhood.  (ECF No. 16, Exh. E ("Warrant and Warrant Application"), Flanagan Aff., ¶ 7(b)).  Defendant was arrested and his vehicle was towed back to WCPD Headquarters.  (*Id*. ¶ 5d.)

After Defendant's arrest, law enforcement officers from the WCPD and Homeland Security Investigations searched the Gray Equinox and found (i) approximately 112 grams of a substance later found through field testing to contain crack; (ii) approximately $34,000 in cash;

(iii) a black Smith & Wesson 9mm semiautomatic pistol containing 10 rounds of ammunition and a black Taurus 9mm semiautomatic pistol containing 8 rounds of ammunition; (iv) two additional ammunition magazines.  (*Id.*  ¶ 6.)

The next day, on March 11, 2022, Magistrate Judge Andrew E. Krause ("Judge Krause") signed the Subject Devices Warrant authorizing the search of Defendant's two phones, one of which Defendant carried on his person during his arrest and the other which he had on the dashboard for navigation.  (*See* Warrant and Warrant Application.)  Judge Krause also signed the Complaint, which charges Defendant with one count of possession of crack cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).  (Complaint ¶¶ 1–3).  Defendant was released on bond that same day.  (*See* ECF No. 4.)  An indictment was filed on March 22, 2022 (ECF No. 5), and Defendant was arraigned on the two count indictment on April 5, 2022.

On August 15, 2022, Defendant filed the instant motion to suppress.  (ECF Nos. 15, 16 ("Def.'s Br."). The Government filed an opposition on September 13, 2022.  (Govt's Opp.), and Defendant filed a reply on October 14, 2022. (ECF No. 21 ("Def.'s Reply").)

## LEGAL STANDARD

### I.    Motions to Suppress and Evidentiary Hearings

To defeat a suppression motion, "[t]he Government bears the burden of proof as to establishing probable cause" or reasonable suspicion, as the case may be.  *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008).  The Government must make this showing "by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

"[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (internal quotation mark omitted).  A defendant may not rely on "bald assertions," and "[w]ithout specification of the factual basis" that supports suppression, "the district court is not required to have a hearing." *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998); *see also United States v. Viscioso*, 711 F. Supp. 740, 745 (S.D.N.Y. 1989) ("A hearing is not required if the defendant's statements are general, conclusory or based on conjecture.").  Moreover, although the Government's reliance on "unsworn statements" in its Memorandum of Law may generally not be enough for a court to make a finding of fact, *see United States v. Marquez*, 367 F. Supp. 2d 600, 603 (S.D.N.Y. 2005), a defendant nevertheless bears the initial burden of establishing, by an affidavit of someone with personal knowledge of the underlying facts, that there are, in fact, disputed issues of material facts, *Viscioso*, 711 F. Supp. at 745 (citing *United States v. Caruso*, 684 F. Supp. 84, 87 (S.D.N.Y. 1998)).  "[A]n attorney's affidavit, absent personal knowledge[,] is insufficient to justify a suppression hearing." *United States v. Cook*, 348 F. Supp. 2d 22, 28 (S.D.N.Y. 2004).  *See, e.g., United States v. Gillette*, 383 F.2d 843, 848 (2d Cir.1967) ("The affidavit submitted for appellant is insufficient in that it does not, for example, allege personal knowledge on the part of [the affiant].").

## II.    **Reasonable Suspicion for *Terry* Stops**

An officer may briefly stop a vehicle when he or she has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).  "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably

less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Prado Navarette v. California*, 572 U.S. 393, 397 (2014); *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  Reasonable suspicion is established where an officer is "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975).  The "reasonable suspicion" inquiry requires courts to "look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Freeman*, 735 F.3d at 96 (emphasis omitted).  Courts "evaluate this totality of the circumstances 'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training,' [but may] 'not merely defer to the police officer's judgment." *Id*. (quoting *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (internal quotation marks omitted)).

### III.    Warrantless Searches

Typically, a search or seizure is not reasonable unless it is conducted pursuant to a warrant issued upon probable cause. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).  Warrantless searches may be reasonable in special circumstances, but "must still generally be based upon probable cause." *Nicholas v. Goord*, 430 F.3d 652, 660 (2d Cir. 2005).  A warrantless arrest is unreasonable unless the arresting officer has probable cause to believe that the arrestee is committing or has committed a crime.  *United States v. Delossantos*, 536 F.3d 115, 158 (2d Cir. 2008). "Probable cause exists where the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Id*. (quoting *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007)).

IV.     **Search Warrants**

The Fourth Amendment prohibits "unreasonable searches and seizures," and mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.  As the Supreme Court has stated, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  Therefore, the probable-cause determination "is not overly strict."  *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005). "Presented with a warrant application, [a] judge must 'simply . . . make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him [or her] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *Id*. (quoting *Gates*, 462 U.S. at 238, 103 S.Ct. 2317) (emphasis in original). "The quanta of proof necessary to establish probable cause is 'only the probability, and not a prima facie showing, of criminal activity.'"  *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 235, 103 S.Ct. 2317).

Once a warrant has been issued by a judge and executed, the duty of a court reviewing a magistrate judge's probable cause determination on a motion to suppress is far more limited: its task is "simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed." *Gates*, 462 U.S. at 238–39 (quoting *Jones v. United* States, 362 U.S. 257, 271 (1960)).  The issuing magistrate's decision is "entitled to substantial deference, and 'doubts should be resolved in favor of upholding the warrant.'"  *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (quoting *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983)).  Indeed, the magistrate's "finding of probable cause is itself a substantial factor tending to uphold the validity

of [the] warrant." *Travisano*, 724 F.2d at 345.  "Such deference derives not only from the law's recognition that probable cause is 'a fluid concept' that can vary with the facts of each case, but also from its 'strong preference' for searches conducted pursuant to a warrant[.]" *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 232).  Thus, the "task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." *Id*. (quoting *Gates*, 462 U.S. at 238).

## V.    Exclusionary Rule

"Evidence obtained by exploitation of a primary illegality is regularly excluded under traditional taint analysis as the 'fruit of the poisonous tree.'" *United States v. Morales*, 788 F.2d 883, 885 (2d Cir. 1986) (citing *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)).  This exclusionary rule "reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. Cacace*, 796 F.3d 176, 188 (2d Cir. 2015) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).  For evidence to be suppressed, it is not enough to establish that the evidence would not have been obtained "but for" the illegal search or seizure. *See United States v. Nayyar*, 221 F. Supp. 3d 454, 467 (S.D.N.Y. 2016).  "Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 487–88 (internal quotation and citation omitted).

## DISCUSSION

Defendant argues that the search and seizure undertaken by law enforcement, along with the warrantless search of his phones, violated his constitutional rights.  (ECF No. 16, Def.'s Br. at 2–3.)  By his motion, the Defendant asks the Court to suppress the firearms, narcotics, and digital evidence from his phones that were recovered as "fruit" of the purported unlawful search and seizure.  Alternatively, Defendant asks the Court to set a hearing: (i) to determine whether law enforcement officers had sufficient cause to justify Defendant's traffic stop on March 10, 2022, including whether Defendant committed a traffic violation and whether the Government can rely on LPR readers and the purported multi-year investigation to justify the stop and the warrantless search that followed; (ii) to determine whether law enforcement had reasonable suspicion to extend the traffic stop and conduct a K-9 search on March 10, 2022; and (iii) to challenge the K-9's reliability and therefore probable cause for law enforcement's search inside Defendant's vehicle. (Def.'s Br. at 3–12.)  Defendant also requests that the Government produce discovery on the K-9's training, field performance, and instances of false positives, which will allow Defendant to contest the K-9's reliability, and therefore, challenge whether law enforcement had probable cause to search inside his vehicle.  (*Id*. at 10–11 n.4.)  Defendant also asks the Court to suppress all "fruit" derived from the phones, because they were searched before an issuance of a warrant, and to set a *Franks* hearing to challenge the search warrant that was eventually issued.  (*Id*. at 12–24.) Lastly, Defendant argues that the search warrant that was eventually issued is invalid, and therefore, all fruit derived from the phones after the search warrant was issued should be suppressed.  (*Id*. at 19–24.)

The Government opposes all of Defendant's request, contending they are without merit. (*See* Govt. Opp. generally.)  The Court addresses the parties' arguments according to the order above.

11

I.       **Reasonable Suspicion to Initiate March 10, 2022 Stop**

The Government gives two reasons why Defendant's stop on March 10, 2022 was justified: (i) Defendant violated traffic laws by speeding and making an unsafe and illegal lane changes; and (ii) Defendant's vehicle was identified as suspicious during a broader drug trafficking investigation by the WCPD.  (Gov't. Opp. at 9, 13.)  Defendant, on the other hand, argues that law enforcement did not have probable cause or reasonable suspicion to pull him over in the first place, and therefore, all evidence must be suppressed.  (Def.'s Br. at 3–4.)  In his affirmation under 28 U.S.C. § 1746, Defendant denies having committed a traffic violation.  (Def.'s Br. at Exh. A (hereinafter, "Zayas Affirmation"), ¶ 4.)  Defendant also argues that the discovery provided by the Government, which alleges that Defendant was under investigation because a car registered to him made nine trips to New York over a 19-month period, is insufficient to justify the stop and the subsequent warrantless search that took place on the day of his arrest.  (Def.'s Br. at 4.)  Defendant argues that because travel is constitutionally protected, law enforcement should not be permitted to violate a traveler's "Fourth Amendment rights merely because the motorist exercised their Fifth Amendment right to travel." (*Id*. at 4.)  Alternatively, Defendant argues that a hearing is necessary because of the factual disputes regarding whether Defendant committed a traffic violation and to allow Defendant to challenge the evidence the Government relies on with respect to the multi-year investigation.  (Def.'s Reply at 6.).

For the reasons indicated below, the Court agrees that an evidentiary hearing should be held to determine the threshold question on whether law enforcement had reasonable suspicion to initiate the traffic stop on March 10, 2020.  The Court also finds that the facts gathered by the WCPD investigation, alone, cannot justify a stop, and therefore, the Court will not grant a hearing to allow Defendant to challenge the facts gathered during the investigation.  In any event, even if

such facts were sufficient to justify the stop, Defendant fails to indicate any specific factual basis it wishes to contest, and therefore the Court need not hold a hearing.  *See United States v. Viscioso*, 711 F. Supp. 740, 745 (S.D.N.Y. 1989) ("the Court is not required as a matter of law to hold an evidentiary hearing if [defendant's] papers did not state sufficient facts which, if proven, would have required the granting of the relief requested.") (internal quotation and citation omitted); *Id*. ("A hearing is not required if the defendant's statements are general, conclusory or based on conjecture.").

### Traffic Violation

Courts have held that officers may stop a vehicle where there is reasonable suspicion that a traffic violation occurred. *See Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2009) ("We have held repeatedly that a traffic stop based on a reasonable suspicion of a traffic violation comports with the Fourth Amendment."); *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994) ("When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.").  Both speeding and unsafe lane change are traffic offenses under New York law.  *See* N.Y. Veh. & Traf. Law §§ 1128, 1180.  A traffic stop can also serve as a pretext for making a stop.  *United States v. Dhinsa*, 171 F.3d 721, 724–25 (2d Cir. 1998) ("An officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance.").

Defendant submits an affirmation under 28 U.S.C. § 1746 stating,[2] *inter alia*, that he was "obeying all traffic rules and laws" at the time he was pulled over by law enforcement. Zayas Aff. ¶ 4; *id*. ("I specifically deny speeding, driving unsafely, following too closely, tailgating, or improper merging."). Defendant also states in his affirmation that he was not specifically told that he was speeding at the time that he was pulled over. *Id*. The Government provides no affirmations or affidavits to the contrary, and only states that "the Government anticipates that Officer DiRienzo would credibly testify that he observed the Gray Equinox change lanes without signaling and exceed the speed limit before he pulled it over." (Gov't. Opp. at 13.)

Because there is a material issue regarding whether there was a traffic violation—which presents a threshold issue of whether law enforcement had reasonable suspicion to initiate the stop in the first place—it is appropriate to set a hearing on this issue.

### WCPD Investigation

The Government contends that in addition to the traffic violations, law enforcement had reasonable suspicion to pull over Defendant because his vehicle was identified as suspicious during a broader narcotics investigation by WCPD. (Gov't Opp. at 9.) The Government states that before Defendant's Gray Equinox was pulled over, the head of the RTC Intelligence Unit had "specific articulable facts" that, viewed collectively, "reasonably warrant[ed] suspicion." (*Id*. at 9–10) (citing *Brignoni-Ponce*, 422 U.S. at 884). The Government avers that the investigation had collected the following information: (i) that Defendant had a prior felony conviction for narcotics trafficking, and had additional prior arrests for narcotics and weapons offenses; (ii) LPR data showed that, over the past years, the Gray Equinox made numerous short round trips to the New

---

[2]    While Defendant did not submit an *affidavit*, "28 U.S.C. § 1746 provides that unsworn declarations made under the penalty of perjury have the same evidentiary weight as affidavits." *Williams v. Elzy*, No. 00 CIV. 5382 (HBP), 2003 WL 22208349, at *5 (S.D.N.Y. Sept. 23, 2003).

York City area, during at least some of which the car turned around in less than an hour; (iii)

vehicle service data showed the car having more than twice the average annual mileage; (iv) when

the Gray Equinox was stopped, it had traveled the same route before on several prior occasions,

including on or about October 16, 2020, when it turned around and headed north in less than an

hour; (v) mid-size SUVs such as the Gray Equinox are commonly used by drug traffickers for the

installation of hidden compartments; (vi) Defendant had sold his last car, also a mid-size SUV, to

an individual who had multiple prior convictions for narcotics offenses, and whose previous car

had been taken by the police; and (vii) narcotics traffickers often travel large distances to conduct

a transaction and return quickly to their origin city.  (*Id*. at 9–10.)[3]

In response, Defendant argues that a stop based on his automobile's prior trips to New

York City, combined with his 2012 drug-related conviction under Mass. Gen. Law 94C § 32E,[4]

was unlawful and not justified by reasonable suspicion.  (Def.'s Reply at 6.)  Defendant avers that

the Government's argument, if accepted "would circumvent *Terry* and effectively permit intrusive

seizures and investigations of anyone with a criminal record who occasionally drives to a large

city." (Def.'s Reply at 3) (citing *Terry*, 392 U.S. at 21 ("the police officer must be able to point to

specific and articulable facts which, taken together with rational inferences from those facts,

reasonably warrant" a seizure.)).  Defendant also argues that the Government fails to allege that

---

[3]      The Government relies on the collective knowledge doctrine to get around the fact that Officer DiRienzo himself did not conduct or have full knowledge of the WCPD's investigation. (Govt. Opp. at 12.)  *See Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983) ("where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all."); *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986) ("[I]n light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates."). In the Police Report, Officer DiRienzo states that he was aware that the Gray Equinox was part of the investigation at the time that he observed the vehicle on the road on March 10, 2022. (*See* Def.'s Br. at Exh. B (hereinafter "Police Report").  Defendant does not contest that the application of the collective knowledge doctrine applies here. (*See* Def.'s Reply, generally).

[4]      Defendant states that according to a RAP sheet received during discovery, Defendant has one prior conviction under Mass. Gen. Law 94C § 32E stemming from a September 13, 2012 arrest in Massachusetts.  Defendant was convicted of trafficking a small amount (between 18 and 36 ounces) of cocaine.  (Def.'s Reply at 4.)

Defendant had previously driven drugs to New York City or that he had previously been a drug courier, and instead, merely argues propensity—that a prior drug convictions means justification for a seizure.  (Def.'s Reply at 4.)  Lastly, Defendant asserts that in the alternative, a hearing on the Government's evidence gathered in this investigation is merited.  (*Id*. at 6.)

Whether the facts gathered from the investigation are alone sufficient to justify Defendant's stop, presents a close question.  Out of an abundance of caution, the Court is not inclined to view the facts gathered by the investigation, on their own, as sufficient to create reasonable suspicion to justify a stop.  Certainly, it is well established that law enforcement can use a traffic violation as a pretext for pulling over a suspect, but the Government fails to cite to, and the Court did not identity, any cases allowing similar investigations to justify a traffic stop on their own.  *United States v. Gomez*, 751 F. App'x 63, 67 (2d Cir. 2018) ("it is established that "[i]f an officer has observed a traffic violation, his actual motivation for stopping the vehicle is irrelevant to whether the stop is constitutionally reasonable.").

The Government relies on Defendant's drug conviction, which occurred more than 10 years ago in Massachusetts, on his vehicle's history on a major parkway, and on the short duration of the vehicle's trips, but provides no allegations that there are any specific indications of drug trafficking in New York by Defendant.  The Court is therefore persuaded by Defendant's argument that allowing law enforcement to pull over Defendant based on what has been collected by the WCPD investigation may promote intrusive seizures against individuals with similar criminal histories and also risks infringing on Defendant's constitutionally protected right to interstate travel.  (Def.'s Reply at 3.)  *See Reid v. Georgia*, 448 U.S. 438, 441 (1980) (seizure of suspected drug couriers at an airport not supported by reasonable suspicion because the "circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually

random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure"); *Jones v. Cuomo*, 542 F. Supp. 3d 207, 220 (S.D.N.Y. 2021) ("While the 'right to travel' is not explicitly mentioned in the text of the Constitution, it is "firmly embedded" in the Supreme Court's jurisprudence.").

       None of the cases the Government cites to supports its argument that the facts coming out of the investigation justify Defendant's stop on their own, and instead, they are distinguishable. In *Gomez*, law enforcement identified the defendant's vehicle as one that was flagged by DEA agents, and stopped the vehicle after observing it commit two traffic violations.   *Gomez*, 751 F. App'x at 65.  In addition to stopping Defendant for a valid traffic violation, law enforcement had reasonable suspicion that Defendant was involved in narcotics trafficking based on information from an informant, the fact that the vehicle was supplied by the DEA through the informant, and the fact that DEA had additional information indicating that the defendant had traveled out of state to pick up cocaine. *Id*. at 65–66, 68.  In *United States v. Arvizu*, 534 U.S. 266, 277 (2002), local law enforcement stopped a Defendant and his family for reasonable suspicion after observing the family traversing through empty routes commonly used by smugglers and pass by recreational areas, noticing the children's knees elevated in a way that suggested concealed cargo in the passenger compartment, and observing the children wave at his law enforcement car peculiarly for five minutes. *Id.* at 269, 277.  For the case at hand, the facts gathered in the WCPD investigation do not provide specific indications of narcotics trafficking like in the cases that the Government cites.  Rather, the Court agrees with Defendant that the Government attempts to rely on propensity based on his previous drug conviction and the travel history of Defendant's vehicle to try to reach reasonable suspicion justifying the stop —but doing so would render reasonable suspicion too far reaching.

II.        **Whether the Seizure Was Unlawfully Extended**

Before deciding on Defendant's motion to suppress, the Court must determine whether there was reasonable suspicion to stop Defendant's vehicle in the first place, *i.e.*, whether he committed a traffic violation.   *See supra*.   Even so, given that Defendant requests a hearing on several issues (including whether there was reasonable suspicion to extend the traffic stop, including by having a K-9 sniff the outside of the Gray Equinox), the Court will determine whether such requests for hearings should be granted were the Court to find that the traffic stop was justified.

For the reasons indicated below, were the traffic stop justified to begin with, the Court would find that there was reasonable suspicion to extend the traffic stop and have the K-9 sniff the car.  Therefore, the Court denies Defendant's request for a hearing on this issue.

With respect to traffic stops, a "tolerable duration is determined by the seizure's 'mission,' which is to address the traffic violation that warranted the stop, and attend to related safety concerns.  Authority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 348–49 (2015) (internal citations omitted).  "The Fourth Amendment may tolerate certain unrelated investigations that do not lengthen the roadside detention, but a traffic stop become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket."  *Id*. at 349 (internal citations omitted) (modifications in original).  However, "[a] traffic stop may be extended for investigatory purposes if an officer develops a reasonable suspicion of criminal activity supported by specific and articulable facts." *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015).  In addition, extending a traffic stop by conducting a dog sniff is permissible as long as there was reasonable suspicion for doing so.  *See Rodriguez*, 575 U.S. at 358 (2015).

The Court agrees with Defendant that Officer DiRienzo did extend the stop by (i) asking questions unrelated to the traffic violation—including what life was like for Defendant in Massachusetts, and about the taxes in Massachusetts—in order to give another officer time to walk around and look inside Defendant's vehicle; (ii) by telling Defendant "as long as your license is valid, I'm not going to give you a ticket, I think that's reasonable" but then directing Defendant to continue waiting outside his car with another officer for nearly seven minutes (Footage at 4:13–20); (iii) by returning to Defendant after those seven minutes to ask Defendant whether he carried any contraband in the vehicle (Footage at 11:36–12:50); (iv) by asking if he could search Defendant's car "bumper to bumper including everything inside of it (Footage at 12:50–54); and (v) by having the car sniffed from the outside by the K-9.  Clearly, law enforcement sought to address not only the traffic violation, but also possible narcotics trafficking.  *United States v. Gomez*, 877 F.3d 76, 89 (2d Cir. 2017) ("tasks not related to the traffic mission, such as dog sniffs or '[o]n-scene investigation into other crimes,' are unlawful if they prolong the stop absent independent reasonable suspicion") (internal citations omitted); *United States v. Gomez*, 199 F. Supp. 3d 728, 742 (S.D.N.Y. 2016), *aff'd*, 751 F. App'x 63 (2d Cir. 2018) ("Typically [traffic violation] inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.")

The question, then, is whether law enforcement had reasonable suspicion of criminal activity to justify the extension of the seizure beyond the traffic stop.  *See Rodriguez*, 575 U.S. at 355.  Factors that give rise to reasonable suspicion are considered and weighed "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Santillan*, 902 F.3d at 58 (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981); *see also United*

*States v. Colon*, 250 F.3d 130, 134 (2d Cir. 2001) ("In determining whether there is reasonable suspicion under the totality of the circumstances, "the court must evaluate those circumstances 'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.") (citing *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000)).

The Government argues that the investigative work by WCPD's Intelligence Unit gave law enforcement reasonable suspicion of narcotics trafficking to justify the extension of the stop, and in particular the K-9 search.  (Gov't Opp. at 14–15.)  Second, the Government argues that law enforcement had reasonable suspicion to extend the stop because the officers noticed that Defendant laughed nervously, licked his lips, avoided eye contact, had a volume change when speaking about illegal items, shook his leg, and gave inconsistent responses regarding his destination. (*See* Police Report; *see also* Govt. Opp. at 15 (citing *United States v. Peterson*, 100 F.3d 7, 11 (2d Cir. 1996) (finding reasonable suspicion where officers "noted the inconsistency in [the defendant's] statements as to his address and observed his apparent nervousness").

The Court is not inclined to agree with the Government that the facts gathered by the WCPD investigation, *alone*, gives rise to reasonable suspicion.  *See supra*.[5]  However, the Court finds that "reasonable suspicion" is reached when the facts gathered by the WCPD investigation is paired along with the nervous behavior observed by Officer DiRienzo.  Nervousness is a factor supporting reasonable suspicion.  *See United States v. Santillan*, 902 F.3d 49, 57 (2d Cir. 2018); *United States v. Peterson*, 100 F.3d at 11 (finding reasonable suspicion where officers "noted the inconsistency in [the defendant's] statements as to his address and observed his apparent nervousness"). In the Police Report, Officer DiRienzo reports that Defendant "provided noticeable

---

[5]       The Court also notes that upon its own review of the video evidence provided by the Government, it is clear that a law enforcement officer accompanying Officer DiRienzo walked around and peered into the car, and did not readily identify contraband.  (Footage at 3:20–4:31.)

delays in responding to some questions, was licking his lips frequently appearing to developing [sic] cottonmouth, provided vague answers, was consistently looking away not making eye contact with me while speaking with me [sic], displayed nervous laughter, had a volume change when speaking about illegal items, and had visible shaking in his legs." (Police Report at 2).   While, upon review of the Footage of the March 10, 2022 stop, the Court disagrees that Defendant laughed nervously and provided inconsistent responses as to his destination,[6] the Court agrees with the observation that Defendant licked his lips, drank sips of water, and looked away in several instances. [7]   Coupled with the fact that Officer DiRienzo was aware that Defendant's car had been identified as suspicious by the WCPD investigation,  and that Officer DiRienzo knew through his own experiences in law enforcement that the parkway was a corridor for illicit conduct, the Court finds that reasonable suspicion would have been established.  *See, e.g. United States v. Gomez*, 199 F. Supp. 3d 728, 743 (S.D.N.Y. 2016), *aff'd*, 751 F. App'x 63 (2d Cir. 2018) ("In this case, however, Trooper Whittaker was aware of other information that—together with his observations at the scene—gave him reasonable suspicion to justify a continued detention."); *see also United States v. Gomez*, 877 F.3d 76, 93 n.27 (2d Cir. 2017) ("an officer may conduct a pretextual stop based on a traffic violation and then, in full compliance with *Rodriguez*, extend the stop if the officer develops reasonable suspicion based on the actions of a driver or passenger either (i) before the stop, or (ii) during traffic-related processing of the stop.").

### III.    Whether Law Enforcement Conducted A Warrantless Search Without Probable Cause

---

[6]      The Government attempts to argue that Defendant gave inconsistent responses regarding his destination, "first agreeing that Lincoln Hospital was in the Yonkers, then saying it was in the Bronx."  (Gov't Opp. at 15.) However, upon review of the video evidence, the Court disagrees with the Government's framing of Defendant's response, finding that Defendant, a Massachusetts resident, was not inconsistent when he stated he was going to Lincoln Hospital to visit his aunt, that he did not know where Lincoln Hospital but believed it was "definitely in the Bronx," and that he relied on his GPS to get to the location. (Footage at 2:42–3:57).

[7]      The Footage only displays Defendant from his torso and upwards, and therefore whether or not Defendant was shaking his leg cannot be determined by reviewing that exhibit.  (*See* Footage.)

Defendant argues that the narcotics and guns recovered from Defendant's automobile must be suppressed because law enforcement conducted a warrantless search without probable cause. (*See* Def.'s Br. at 9.)  In the alternative, Defendant requests a hearing on whether the K-9, which provided a positive narcotics alert, was reliable and therefore could provide probable cause to search inside his vehicle.  (Def.'s Br. at 10–12.)  Defendant also requests that the Court order the Government to provide the K-9's training and field performance, including all instances of false positives.  (Def's Br. at 10–11; Def.'s Reply. at 7, n.2).

The Government opposes these requests, stating that it has produced the K-9's certification by the New York State Division of Criminal Justice Services, a bona fide organization, and that Defendant "has not raised any fact that would challenge this certification or Liberty's reliability." (Gov't Opp. at 25.)  Government avers that "the Court is permitted to, and should, rely on [the K-9's] certification to find the canine reliable without a hearing."  (*Id.* at 25.)  The Government also opposes Defendant's request for the K-9's training and field performance, including all instances of false positives.  (*Id.*; Def.'s Br. at 7 n.2.)

The parties agree that in order to search Defendant's car, law enforcement needed probable cause to believe it contained contraband.  (Def.'s Br. at 9; Gov't Opp. at 15.)  *See Arizona v. Gant*, 556 U.S. 332, 347 (2009); *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004) ("Under the 'automobile exception' to the Fourth Amendment warrant requirement, police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime").  A canine's positive indication for narcotics is sufficient to provide probable cause.  *See Florida v. Harris*, 568 U.S. 237, 247 (2013) ("[A] court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.").  Here, the Government argues that law enforcement had probable cause to

search the Gray Equinox once the K-9 sniffed the car and indicated the scent of narcotics.  (Gov't Opp. at 15.)

"If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."  *Harris*, 568 U.S. at 247.  However, a defendant "must have an opportunity to challenge such evidence of a dog's reliability.  *See id; see also United States v. Wofford,* No. 19-CR-6061EAW, 2021 WL 95916, at *20 (W.D.N.Y. Jan. 11, 2021), *report and recommendation adopted*, 527 F. Supp. 3d 486 (W.D.N.Y. 2021) ("a defendant 'must have an opportunity to challenge ... evidence of a dog's reliability,' whether by (1) 'cross-examining the testifying officer,' (2) 'introducing his own fact or expert witnesses,' (3) contesting 'the adequacy of a certification or training program,' or (4) inquiring whether 'circumstances surrounding a particular alert may undermine the case for probable cause").

From the outset, the Court grants Defendant's request for discovery on the dog's training, field performance, and instances of false positives.  The Second Circuit has found that while field performance records are not required to establish probable cause to search based on a dog's positive narcotics alert, they are still relevant as evidence of the dog's reliability.  *United States v. Foreste*, 780 F.3d at 529 (finding that district court abused discretion by denying Defendant's request for narcotics canine's field performance); *see also United States v. McKenzie*, No. 1:14-CR-169 (MAD), 2015 WL 13840885, at *13 (N.D.N.Y. Nov. 4, 2015), *aff'd*, 13 F.4th 223 (2d Cir. 2021) ("when a defendant requests dog-history discovery to pursue a motion to suppress, Federal Rule of Criminal Procedure 16 compels the government to disclose the handler's log, as well as training records and score sheets, certification records, and training standards and manuals) (citing *United States v. Cedano–Arellano*, 332 F.3d 568, 570–71 (9th Cir. 2003) (internal quotations

23

omitted)); *id.* ("disclosures are 'mandatory' when the government seeks to rely on a dog alert as the evidentiary basis for its search.").

With respect to Defendant's request for a probable cause hearing, the Government contends that Defendant must first raise a disputed issue of material fact as to the K-9's certification or reliability before the Court set a probable cause hearing.  (Gov't Opp. at 24–25) (citing *United States v. Ligon*, 861 F. App'x 612, 621 (6th Cir. 2021) ("Because [the defendant] did not contest that [the dog] was certified by a bona fide organization, the district court did not err by presuming that the canine's alert provided probable cause to search without holding an evidentiary hearing."); *United States v. Nunez*, 753 F. App'x 450, 451 (9th Cir. 2019) ("Because [the defendant] failed to identify a factual dispute as to the canine's reliability in his moving papers, the district court did not abuse its discretion in denying him an evidentiary hearing on the reliability of the canine's alert.")).    Based on the Defendant's request for discovery on the K-9's training and field performance, the Court finds that Defendant has not yet had a sufficient opportunity to review the full discovery he likely needs to adequately raise an issue of material fact as to the K-9's reliability.[8]

The Court will therefore not set a probable cause hearing at this time given that discovery needs to be produced regarding the K-9's training and field performance, and Defendant must be able to articulate what facts he seeks to contest.  Defendant may seek to suppress on the basis of the K-9's reliability after it has reviewed the relevant discovery.

### IV.    Whether the Warrantless Search of Defendant's Phones Was Unlawful and All "Fruits" Of the Search Must Be Suppressed

---

[8]        The Court also notes that the Government presents no affidavit, nor is one available with the warrant application, regarding the K-9's certification or training.  *See, c.f., United States v. Cordero*, 5:13-cr-166; 2014 U.S. Dist. LEXIS 95227 (D. Vt. 2014) (where government submitted evidence of canine's certification and ongoing training and defendant did not identify any evidence which would call into question the canine's reliability, the officer had probable cause to search the defendant's truck based upon the canine's alert).

Assuming, *arguendo*, that there was reasonable suspicion to initiate the traffic stop *and* probable cause to search inside Defendant's vehicle, the Court would agree with Defendant that the GPS information gathered from Defendant's two phones on the day of the arrest (prior to the issuance of the Subject Device Warrant the next day), and related testimony, must be suppressed.

Defendant argues that law enforcement ignored the *Riley* mandate, which requires a warrant before searching a cell phone seized incident to an arrest, when searching Defendant's phone without a warrant, and that therefore all "fruits" from this search must therefore be suppressed.  (Def.'s Br. at 13, 17.) *See Riley v. California*, 573 U.S. 373, 403 (2014).  Defendant claims that by the time of Defendant's initial presentment on March 11, 2022, the Government stated that law enforcement knew Defendant had been driving to Washington Heights (and not Lincoln Memorial Hospital) based on GPS location on his phone.  (*Id.* (citing Transcript from Zayas's Initial Presentment at 14–15 (ECF No. 16, Exhibit C)).  Defendant further points to screenshots of body camera footage of the day of the arrest showing that Defendant's phone did not display the address he was traveling to, and therefore the Government may not argue that the "plain view" doctrine allowed the Government to learn about Defendant's travels.  (Def.'s Br. at 13–14.)  The footage indicating shows an officer manipulating Defendant's phone, providing evidence that a warrantless search occurred before the Subject Device Warrant was issued.  (*See id.* at 15 (showing screenshots).)

As Defendant points out, the Government does not explicitly contest this point as to the GPS data observed on March 10, 2022, including information regarding where Defendant was driving to at that time and related testimony.  (*See* Def.'s Reply at 7.).  Therefore, the Court finds that this evidence would be suppressed under *Riley*.

The Government only argues that the Court should deny suppression of the pictures in Defendant's Exhibit D, which were taken starting at 10:40 am on March 11, 2022, because such photos played no part in the warrant affidavit, and they "would have been inevitably discovered if agents had waited until 10:53 [when the Subject Devices Warrant was issued]." (Gov't Opp. at 6.)   "Under the 'inevitable discovery' doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded "if the government can prove that the evidence would have been obtained inevitably" without the constitutional violation." *United States v. McCutcheon*, No. 14-CR-26(S), 2016 WL 11483438, at *12 (W.D.N.Y. June 22, 2016), *report and recommendation adopted*, No. 14-CR-26S (1), 2016 WL 6871001 (W.D.N.Y. Nov. 22, 2016), aff'd, 765 F. App'x 507 (2d Cir. 2019) (citing *Nix v. Williams*, 467 U.S. 431, 447 (1984)).

Should the Court find that Defendant's traffic stop and subsequent search were justified, the Court would agree that discovery of these pictures would have been inevitable. *See United States v. Booth*, 583 F. Supp. 3d 545, 554 (S.D.N.Y. 2022) ("Nonetheless, the Court denies the motion to suppress, because it is clear that the Government would have inevitably discovered the same information when it searched the phone a few days later pursuant to a duly obtained warrant.").

## V.  Whether the Subsequent Warrant That Was Issued Is Invalid and Whether All Fruit From that Warrant Should Be Suppressed

Lastly, Defendant argues that the Subject Devices Warrant that was eventually issued is invalid and that all of its "fruit" should be suppressed because the warrant (i) was not supported by probable cause; (ii) was overbroad because it lacked a time and date limitation on stored information permissible to be searched; and (iii) relied in part on a previous warrantless search. (Def.'s Br. at 19.)  Defendant also requests a *Franks* hearing because he challenges the veracity of the following statement in the warrant application: "the address to which the app was set to

26

navigate was visible, and was located in the Washington Heights neighborhood." (Def.'s Exh. E, Flanagan Aff., ¶ 7(b); Def's Br. at 21 n.10).  Defendant avers that this statement is not true, and is contradicted by the images which appear to show law enforcement accessing Defendant's phone. (*See* Zayas Affirmation, ¶ 13; Def.'s Br. at 21.).

Should the Court determine that there was probable cause to search the Gray Equinox in the first place, the Court is inclined to find that there would have been probable cause to issue the Subject Devices Warrant based on the contraband recovered from the vehicle.   The Government argues, and the Court agrees, that there would have been probable cause to issue the Subject Devices Warrant because (i) Defendant was found to have been carrying crack cocaine, cash, firearms, and ammunition in a secret compartment; (ii) Defendant was driving from Massachusetts to New York City with the contraband; (iii) Defendant had a navigation app open on his phone and another phone on his person; (iv) cellphones contain geolocation information which tracks the location of the phone and allows law enforcement to determine the location at different historical times; and (v) the warrant affiant knew, based on training and experience, that narcotics traffickers often use cellphones to communicate with coconspirators, arrange transactions, and share photos of their illegal wares.  *See Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (emphasis added) (probable cause is demonstrated where "the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place.").

Therefore, the Court finds that a *Franks* hearing is unnecessary, given that there would have been sufficient grounds of issuing the warrant regardless of whether law enforcement found that Defendant was driving to the Washington Heights neighborhood (and not to Lincoln Hospital, as he had told Officer DiRienzo during the traffic stop).  *See United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (defendant is not entitled to a *Franks* hearing if the false statement or

27

omission was not "necessary to the [issuing] judge's probable cause finding."); *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) ("The ultimate inquiry is whether, after putting aside erroneous information and correcting material omissions, there remains a residue of independent and lawful information sufficient to support a finding of probable cause.") (alterations and quotations omitted).

The Court also finds that the Subject Devices Warrant was not impermissibly broad even though it does not have a time and date limitation for the search of electronically stored information.   A search warrant is overbroad in violation of the Fourth Amendment if its "description of the objects to be seized is . . . broader than can be justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446. Here, the Subject Devices Warrant provides guidance as to the evidence to be sought in connection with specific narcotics and firearm criminal offenses.   (*See* Warrant and Warrant Application)  *See, c.f. United States v. Rosa*, 626 F.3d 56, 62 (2d Cir. 2010) ("the warrant directed officers to seize and search certain electronic devices, but provided them with no guidance as to the type of evidence sought."); *States v. George*, 975 F.2d 72, 76 (2d Cir.1992) ("Mere reference to 'evidence' of . . . general criminal activity provides no readily ascertainable guidelines for the executing officers as to what items to seize . . . . [A]uthorization to search for 'evidence of a crime,' that is to say, any crime, is so broad as to constitute a general warrant.").  Moreover, the "lack of a time frame in itself does not transform what is otherwise a relatively particularized document into an unconstitutional general warrant." *See United States v. Hernandez*, No. 09 CR 625 (HB), 2010 WL 26544, at *11 (S.D.N.Y. Jan. 6, 2010).

Even if the Subject Device Warrant was broad, the warrant would be protected by the good faith exception. *See United States v. Leon*, 468 U.S. 897 (1984).  Under *Leon*, the exception

protects from suppression a search and seizure made in good faith reliance by government agents based on a search warrant in all but four situations: "(1) where the issuing [judge] has been knowingly misled; (2) where the issuing [judge] wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient . . . that reliance upon it is unreasonable." *Hernandez*, 2010 WL 26544, at *12 (citing *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (internal citations and quotations omitted); *Leon*, 468 at 923. The first three prongs are not raised as issues, nor could they be. Defendant just argues that the warrant is facially deficient and should not have been relied upon. (Def.'s Br. at 20.) The Court disagrees. The warrant is sufficiently particularized, as it authorized a search for evidence on the phones of the narcotics and firearm offenses, and naming the particular types of materials to be seized (*e.g.*, photographs, communications, geographic location, and evidence of financial transactions obtained from the commission of the offenses.). (*See* Warrant and Warrant Application.) *See c.f., United States v. George*, 975 F.2d 72, 78 (2d Cir.1992) ("the good faith exception did not apply because a warrant not limited in scope to any crime at all is so unconstitutionally broad that no reasonably well-trained police officer could believe otherwise.") (internal quotations omitted). [9]

## CONCLUSION

For the foregoing reasons, the Court GRANTS: (i) an evidentiary hearing to determine whether Defendant committed a traffic violation, thereby purportedly justifying his stop; and (ii)

---

[9]    In the alternative, Defendant asks that the Court suppress any search that occurred after March 25, 2022 "because according to the terms of the warrant, the search was to occur on or before March 25, 2022." (Def.'s Br. at 24 n.12 (citing Warrant and Application).) However, as the Government correctly points out, "Rule 41(e)(2)(A) and (f)(1)(A) [of the Federal Rules of Criminal Procedure] refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review." *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 312 (S.D.N.Y. 2018) (citing Fed. R. Crim. P. 41 (e)(2)(B) (emphasis added)). Therefore, Defendant's request should be denied in the event that the exclusionary rule does not apply to the fruits of the March 10, 2022.

Defendant's request for discovery on the K-9's training, field performance, and instances of false positives in order to allow Defendant to contest the K-9's reliability, and therefore, probable cause for law enforcement to search inside the Gray Equinox.

For the reasons discussed below, the Court DENIES (i) a hearing to allow Defendant to challenge facts gathered in the WCPD's investigation through the adversarial process; (ii) a hearing to determine whether law enforcement had reasonable suspicion to extend the traffic stop; (iii) a probable cause hearing to determine whether the K-9 who search Defendant's car is reliable, given that discovery is still needed on this issue; and (iv) a *Franks* hearing on the Subject Devices Warrant.

Dated:   November 7, 2022
         White Plains, New York

SO ORDERED:

NELSON S. ROMÁN

United States District Judge