UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |
|---|---|
| UNITED STATES OF AMERICA | 22 Cr. 178 (NSR) |
| – v. – | |
| DAVID ZAYAS | |

_____

<u>DAVID ZAYAS'S MOTION TO SUPPRESS ALL EVIDENCE
STEMMING FROM THE WARRANTLESS SEARCH OF YEARS
OF HIS LOCATION DATA</u>

> Benjamin Gold
> Assistant Federal Defender
> Federal Defenders of New York
> 81 Main Street, Suite 300
> White Plains, New York 10601
>
> Sidney Thaxter
> Senior Litigator, 4th Amendment Center
> NACDL
> 1660 L. St. NW, 12th Floor
> Washington DC 20036
>
> Attorneys for DAVID ZAYAS

To:   Honorable Nelson S. Román
      United States District Court Judge
      Southern District of New York
      300 Quarropas Street
      White Plains, New York 10601

      Damian Williams
      United States Attorney
      Southern District of New York
      300 Quarropas Street
      White Plains, New York  10601
      Timothy Josiah Pertz
      Assistant United States Attorney

## NOTICE OF MOTION

David Zayas (herein "Mr. Zayas") moves this Court for an order suppressing all evidence stemming from the warrantless search of years of Mr. Zayas's location information.

## INTRODUCTION

This case began years ago with law enforcement's collection of troves of data memorializing the precise travels of virtually anyone who drives the roads of Westchester County. As conceded by the Government, Mr. Zayas's travels, and those of countless others, were tracked, stored, and preserved for law enforcement to peruse as they saw fit. Law enforcement then choose to conduct an unprecedented search of over 1.6 billion of these location and travel records. This law enforcement search was conducted without judicial supervision, without a suspect, and unconnected to any particular crime. It was a digital dragnet, the results of which caused the government to open an investigation into Mr. Zayas, flag his car for interdiction, and delay his traffic stop while police interrogated him and used a canine to perform a warrantless search of Mr. Zayas and his automobile. Mr. Zayas has a privacy interest in his historical location information and the warrantless collection and search of years of his travels violates the Fourth Amendment. As a result, all evidence obtained from law enforcement's utilization of this unprecedent tracking system, including items recovered following the prolonged seizure and subsequent search of Mr. Zayas's vehicle, must be suppressed.

## STATEMENT OF FACTS

In this case Sgt. Kyle McCarrick and other officers in the Westchester Real Time Crime Center (hereinafter "RTC") searched the location history of Mr. Zayas and hundreds of millions

1

of other people in order to identify driving patterns they deemed, "consistent with interstate narcotics trafficking." *See Opposition to Motion to Dismiss*, at 1-2. They conducted these searches without any judicial oversight and without any reason to believe a specific crime had occurred—let alone any reason to suspect Mr. Zayas of a committing a crime.

This search was conducted using a surveillance system built on automatic license plate readers (hereinafter "ALPR"). *Id.* ALPR systems combine high-speed cameras with analytic image software to collect the plate numbers, images, date, time and GPS location of every vehicle as it passes by a camera.[1] The collection of this ALPR data is indiscriminate by design and captures images (and/or video) of every passing vehicle. *See* Roberts & Casanova*, supra note 1.* Typically, each vehicle's plate number is then compared against "hot lists" of people who law-enforcement agencies have flagged for arrest or investigation. *See id.*  The plate numbers (and associated data) are also added to large databases regardless of whether they matched any plates from the "hot lists." *See id.* In fact, only a tiny fraction of the location data collected is linked to any criminal activity.[2] What happens to those scans once they are entered into a database—including the amount of time they are retained for and with whom they are shared— depends on the policies of the department maintaining the ALPR surveillance network. *See id.* Thus, surveillance networks based on ALPR technology can track people's movements retroactively with a simple search query. The breadth and detail of that search is limited only by the number of cameras inputting information into the database and the length of time the data is retained.

---

[1] David J. Roberts & Meghann Casanova, AUTOMATED LICENSE PLATE RECOGNITION SYSTEMS: POLICY AND OPERATIONAL GUIDANCE FOR LAW ENFORCEMENT, (Sept. 2012), https://www.ojp.gov/pdffiles1/nij/grants/239604.pdf.

[2] *See* George Joseph, *What Are License-Plate Readers Good For*?, BLOOMBERG: CityLab (Aug. 5, 2016), http://www.citylab.com/crime/2016/08/what-are-license-plate-readersgood-for/492083/; Dave Maass & Beryl Lipton, *What We Learned*, MuckRock (Nov. 15, 2018), https://www.muckrock.com/news/archives/2018/nov/15/alpr-what-we-learned/.

The Westchester RTC started in 2017 and operates one of the largest ALPR databases in the country—currently scanning and archiving, approximately ***16.2 million plates per week***. *See RTC FOIL Response*, § 3(B) (Exhibit A).[3] The expansive surveillance network includes 480 ALPR cameras—434 stationary systems and 46 mobile systems. *Id.* at § 3(C). Its cameras also record video footage, GPS coordinates, and utilize artificial intelligence to track and record the make, model, and color of the vehicles in addition to the plate number.[4] The government has refused to provide the location of the fixed cameras but has disclosed that they "change frequently." *See Government Discovery Response* 12/21/22, P. 2 (Exhibit B). The database of location data collected by these cameras currently contains two years' worth of scans, or over ***1.6 billion images***[5] of license plates from ***hundreds of millions of vehicles*** belonging to Westchester County citizens and anyone else who traveled through the area regardless of any connection to a crime. *RTC FOIL Response*, § 4(A).[6] The scope of this surveillance network is likely even larger than reported as the RTC participates in data-sharing with other local departments and has access to a national database containing an unknown number of records.[7]

ALPR surveillance networks have several common law-enforcement uses. First, the police can input the plate numbers of stolen vehicles, wanted persons, or missing persons into a

---

[3] *See also, RTC: Westchester County, NY,* MOBOTIX https://www.mobotix.com/en/lpr-westchester-county-ny (last visited March 10, 2023).

[4] *Id.*

[5] The number estimated by RTC was 1,664,000,000. However, that appears to be an error based on rounding down the weekly numbers to 16 million. The actual number of scans in the database using their statistic of 16.2 million weekly scans is 1,684,800,000.

[6] The exact number of unique plate scans is unknown. However, in 2019 (the most recent year available) Westchester had an average daily traffic volume on monitored roads of 20,604,383 vehicles. *See* New York Bureau of Transportation website: https://data.ny.gov/d/6amx-2pbv/visualization (must utilize the visualization tool to get this data) (last visited March 10, 2023). This is a weekly total of 144,230,681. Dividing the 16.2 million plate scans by that weekly total equals 0.11 or 11%. Eleven of 1,684,800,000 is 185,328,000 unique scans.

[7] RTC is also a part of the Rekor Public Safety Network ("RPSN") which shares ALPR data across every law enforcement agency enrolled in the network. *Rekor Systems Launches Public Safety Network*, BLOOMBERG: BUSINESS (Aug. 21, 2019) https://www.bloomberg.com/press-releases/2019-08-21/rekor-systems-launches-public-safety-network.

"hotlist" that will alert police when that vehicle passes an ALPR camera. *See, e.g., United States v. Thomas*, 997 F.3d 603 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 828 (2022) (officers were informed that a vehicle stolen in an aggravated robbery had been identified in the area by an ALPR). Second, an ALPR database may be queried to identify vehicles that passed by a specific location in order to identify possible suspects or witnesses. *See, e.g., United States v. McLeod*, 2022 WL 2763574, at *2 (D.N.J. July 15, 2022). Third, they may be used to track the locations of known suspects retroactively or in real time. None of these uses resemble the way the ALPR surveillance network was leveraged to surveil the public in this case.

In this case Sgt. McCarrick, and other officers at the RTC—without any reason to suspect any individual, and without connection to any particular criminal investigation—searched the RTC's massive location database to identify travel patterns they believed to be "consistent with interstate narcotics trafficking." *See Opposition to Motion to Dismiss*, at 1. The exact terms of this search is unknown to Mr. Zayas at this time.[8] However, it was conducted without any judicial oversight or any guidance from internal rules or directives of the RTC.[9] Furthermore, the

---

[8] Defense counsel will file a separate motion to compel the Interdiction Analysis report pursuant to F.R.C.P. 16(a)(1)(E). The software platform running the ALPR network for RTC is called Rekor Scout. Based on the government's description of the query this was an "Interdiction Analysis" performed using the "Analytic Report" function of the software. On November 10, 2022, defense counsel filed a demand for "Any and all 'Analytic Reports' or other reports resulting in the identification of or related to the 2020 gray Chevrolet Equinox bearing the Massachusetts license plate 3CD192, or Mr. Zayas." The government in their response asserted that "Nor does WCPD maintain a separate 'Analytic Report' resulting in the identification of or related to the defendant's vehicle." *See* Government Discovery Response 12/21/22. However, this appears to be incorrect as the software provider's website explains, once an "Interdiction Analysis" report is created it is "automatically stored under the 'Reports' module of this menu for further and/or later review." *What is on the Analytic Reports page?*, REKOR, https://help.rekor.ai/what-is-on-the-analytic-reports-page (last visited on February 9, 2023).

[9] The defense asked Westchester County for "All records regarding access to ALPR data, including . . . purposes for which the data may be accessed; purposes for which the data may not be accessed; [and] who may access the data, what procedures they must go through to obtain access, and who must authorize access." Westchester responded, "According to Department Policy; it's a legitimate law enforcement purposes." The County also referenced the Department Manual, and indicated that information could be accessed "thru an Intel Unit supervisor or their designee and he/she must be a sworn Law Enforcement officer or crime analyst working under direct supervision of a L/E officer." *See RTC FOIL Response*, § 5. The County Department Manual, however, contains no specific guidance about proper and improper access and use of the LPR information. Department Manual, § 104.07 (Exhibit C).

4

searches appear to have been run across the entire dataset of more than 1.6 billion ALPR records over a period of two years. Therefore, the search was not just of Mr. Zayas's location information—it was a search of *every* individual in the database over a two-year period. In other words, the government searched the location data of hundreds of millions of people who they had no reason to suspect of any crimes.

Upon searching everyone's personal location information over a two-year period, police located two trips by Mr. Zayas that they deemed suspicious. One of these, occurring on October 16, 2020, showed Mr. Zayas passing southbound through Scarsdale at 12:44 p.m. and then northbound through Yonkers at 3:31 p.m. On August 21, 2021, the records show that he passed southbound through Rye at 8:17 a.m. and through Yonkers at 9:10 a.m. Law enforcement also saw that Mr. Zayas made other trips, but noted nothing specific about these trips that rendered them suspicious. Despite this, law enforcement continued to investigate Mr. Zayas using other data from the RTC surveillance network, among other sources, and eventually "alerted the vehicle" in the ALPR system. When that alert was triggered by Mr. Zayas's travel through Westchester County, Sgt. McCarrick notified P.O. DiRienzo who began following Mr. Zayas and eventually pulled him over. They then used the ALPR data as part of their justification for the stop of the vehicle and subsequent extension of that stop to question Mr. Zayas and conduct a canine sniff of his vehicle. *See Opposition to Motion to Dismiss*, at 8-13, 14-15.

Thus, the identification of Mr. Zayas and investigation into him began with the suspicionless search of his ALPR location information and culminated with the physical search of his vehicle. Therefore, all evidence obtained in this case flowed from the initial search of his ALPR records.

## ARGUMENT

Sgt. McCarrick's search of Mr. Zaya's location information (and that of every person traveling through Westchester County) over a two-year period, without any reason to suspect him (or any individual) of a crime, was a warrantless dragnet search. This court should therefore suppress the "fruits" of that search, *i.e.*, the subsequent seizure of Mr. Zayas and the search of his vehicle.

### I.      Mr. Zayas Has a Reasonable Expectation of Privacy in His Historical Location Information

A person does not surrender all Fourth Amendment protection by venturing into the public sphere. *Carpenter v. United States*, 138 S.Ct. 2206, 2217 (2018). Individuals maintain a reasonable expectation to privacy in their movement over extended periods of time—even when traveling on open roads and in public view. *See id.* (citing *United States. v. Jones*, 565 U.S. 400, 430, (2012) (Alito, J., concurring); *id.* at 415 (Sotomayor, J., concurring).

In *Carpenter*, the court explained that "[a]lthough no single rubric definitively resolves which expectations of privacy are entitled to protection, the analysis is informed by historical understandings 'of what was deemed an unreasonable search and seizure when [the Fourth Amendment] was adopted.'" *Id.* at 2213-14 (quoting *Carroll v. United States*, 267 U.S. 132, 149 (1925)). There, in finding an expectation to privacy in seven days of cell site location information (CSLI), the Court examined the "deeply revealing nature of CSLI, its depth, breadth, and comprehensive reach…." *Id.* at 2223. The Court's analysis focused on several factors: 1) the length of the surveillance, *id.* at 2215, 2220; 2) the precision of the technique, *id.* at 2219; 3) the automatic and indiscriminate collection, *id.* at 2218; 4) the inescapable nature of the technique, and 5) the ability to retrospectively obtain otherwise unknowable information. *Id.*

6

The search in this case was unreasonable and unlike anything conceivable at the founding of our nation and establishment of the Fourth Amendment. It exceeded the level of surveillance possible using other techniques in the length of time it covered, precision of the location information, automatic collection, inescapable nature, and its ability to track everyone retroactively.

**A. The ALPR Database Allows Unprecedented Surveillance of the Public That Threatens Traditional Expectations of Privacy**

The search of Mr. Zayas's location history over a period of two-years represents a search of previously unimaginable proportion that threatens to shatter the "degree of privacy against government that existed when the Fourth Amendment was adopted." *Id.* at 2214 (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)).

Drivers may not have an expectation of privacy when it comes to isolated observations of their license plate or vehicle registration while driving on public roads. *See United States v. Miranda-Sotolongo*, 827 F.3d 663, 667 (7th Cir. 2016) (citing cases); *see also United States v. Matthews*, 615 F.2d 1279, 1285 (10th Cir. 1980).  But this is a different scenario: the ALPR surveillance network here, and the way it was leveraged in this case, is nothing like the isolated reading or input of a license plate into a database. Comparing a single reading of a plate to a search of hundreds of millions of people's location information over a period of two years is like comparing "a ride on horseback… [to] a flight to the moon. Both are ways of getting from point A to point B, but little else justifies lumping them together." *Riley v. California*, 573 U.S. 373, 393 (2014). The question for this court is not whether there is a right to privacy in the isolated observation of a plainly visible license plate on a public road; it is, "whether people have a reasonable expectation of privacy that is violated when the Government, without any basis whatsoever to suspect them of any wrongdoing, collects, and stores for… years their [license

plate location data] for purposes of subjecting it to high-tech querying and analysis without any case-by-case judicial approval." *Klayman v. Obama*, 957 F.Supp.2d 1, 37 (D.D.C. 2013).

Here, a vast network of cameras and a database of location information "has afforded law enforcement a powerful new tool… [which also] risks Government encroachment of the sort the Framers, 'after consulting the lessons of history,' drafted the Fourth Amendment to prevent." *Carpenter*, 138 S.Ct. at 2223 (quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)). Specifically, it allowed the government—without any reason to think that a specific crime had been committed (let alone to suspect any particular person)—to search over 1.6 billion location records for evidence of what they deemed to be "traffic patterns consistent with narcotics trafficking." This would not have been possible without the "ever alert" network of cameras and the "nearly infallible" memory of the ALPR database created and maintained by RTC. *See id.* at 2219. "[I]t is almost impossible to think of late-18th-century situations that are analogous to what took place in this case." *Jones*, 565 U.S. at 420 (Alito, J., concurring). Therefore, the court should find a reasonable expectation of privacy in the two-years of Mr. Zayas's historic ALPR data gathered and accessed by the government in this case.

## B.  The Duration of the Surveillance.

The ALPR data searched in this case exceeded the breadth of the CSLI data searched in *Carpenter* and the GPS data in *Jones* because it spans a longer period of time.

The court, in examining the breadth of location information, must first look to the duration of the surveillance. *See Carpenter,* 138 S.Ct. *at 2215; see also Leaders of a Beautiful Struggle v. Balt. Police Dep't,* 2 F.4th 330, 341 (4th Cir. 2021); *United States v. Moalin*, 973 F.3d 977, 991 (9th Cir. 2020); *Klayman,* 957 F.Supp.2d at 32. This is because "[p]rior to the digital age, law enforcement might have pursued a suspect for a brief stretch, but doing so 'for

8

any extended period of time was difficult and costly and therefore rarely undertaken.'" *Carpenter 138 S. Ct.* at 2217 (quoting *Jones*, at 565 U.S. at 429 (Alito, J. concurring)). Thus, while "relatively short-term" tracking of a "person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable[,]" *Jones*, 565 U.S. at 430 (Alito, J., concurring) (citation omitted), "longer term" tracking "impinges on expectations of privacy." *Carpenter*, 138 S. Ct. at 2231 (quoting *Jones*, 565 U.S. at 430 (Alito, J., concurring)); *see also Jones*, 565 U.S. at 415 (Sotomayor, J., concurring); *Leaders*, 2 F.4th at 341.

Sgt. McCarrick searched Mr. Zayas's location data for a period of two years. The search itself was apparently not specific to Mr. Zayas, but it was a search across all 1.6 billion individuals in the database, including Mr. Zayas. This was not an isolated use of surveillance tools to enhance officer's visual observations a during a discrete "automotive journey" like those police used in *Knotts*. *Carpenter*, 138 S.Ct. at 2215; *see also United States v. Knotts*, 460 U.S. 276, 282(1983). To the contrary: the duration of the tracking here (some 730 days) dwarfs both the 28 days of surveillance considered in *Jones* and the 127 days searched in Carpenter. *See Carpenter*, 138 S.Ct. at 2212; *Jones*, 565 U.S. at 403. In fact, the Court in *Carpenter* held that obtaining as little as seven days of CSLI records was a search under the Fourth Amendment. *Carpenter*, 138 S. Ct. at 2217. Here, without any suspicion that Mr. Zayas had committed a crime, police looked at two years of his location information. This weighs heavily in favor of finding a reasonable expectation to privacy in Mr. Zayas's ALPR location data.

The existence of gaps in the data or timeframe is not dispositive of the expectation of privacy. In other words, the program need not achieve "perfect tracking of all individuals it captures across all the time it covers." *Leaders*, 2 F.4th at 342; *see also Carpenter,* 138 S. Ct. at 2211 (noting that companies only record CSLI when the phone makes a connection to the

9

network, by placing a phone call or receiving a text message). Therefore, while the there are gaps in the two years of surveillance of Mr. Zayas's travel patterns, they do not negate his reasonable expectation of privacy in his location information.

### C.  The Precision of the Location Information.

In analyzing the constitutionality of warrantless location tracking, it is also necessary to examine the precision of the data being searched. *Carpenter,* 138 S. Ct. at 2212, 2218; *see also Leaders*, 2 F.4th at 343.  Here, the multi-year collection of ALPR records and subsequent search allowed law enforcement to identify the precise location of Mr. Zayas with greater accuracy than the GPS tracker that was deemed unlawful in *Jones*. For example, two of the 21 datapoints in this case that the government relied on were 40.913933º latitude by -73.850319º longitude and 40.976852º latitude by -73.758293º longitude. These coordinates are accurate enough to pinpoint the ALPR camera's location to a distance of two-to-four inches and as a result, within feet of the vehicle whose plate was scanned.[10] This provides greater precision than the GPS technology used in *Jones*. *See Jones*, 565 U.S. at 403 (stating GPS device was accurate to within 50 to 100 feet).

By contrast, the precision of CSLI "depends on the size of the geographic area covered by the cell site." *Carpenter*, 138 S. Ct. at 2211. This may be sufficient to place a person "within a wedge-shaped sector ranging from one-eighth to four square miles," for example. *Id.* at 2218. As a result, a single CSLI data point could be used to determine which neighborhood or zip code someone was in; but it would not be accurate enough to identify the block and building. Moreover, even though cell phones "ping" nearby cell sites several times a minute, service

---

[10] See Decimal degrees, WIKIPEDIA, https://en.wikipedia.org/wiki/Decimal_degrees (noting at six decimal places, coordinates are accurate to within 43-to-111 mm and precise enough to identify individual humans).

providers only log when the phone makes a connection, by placing a phone call or receiving a text message, for example. *Id.* at 2211.

Therefore, here the ALPR surveillance system which can track a surveilled license plate within a few feet, is more precise than the GPS location information in *Jones* and the CSLI location information in *Carpenter*.

### D.  The Automatic and Indiscriminate Collection and Retention of ALPR Data.

RTC's ALPR data is overly comprehensive in its reach. Like the CSLI in *Carpenter,* it was collected automatically and indiscriminately, without a connection to any particular investigation, suspect or crime. Thus, "this newfound tracking capacity [of searching ALPR data] runs against everyone," which is precisely the type of warrantless Governmental intrusion that was rejected by *Carpenter. Id.* at 2218, 2223.

Like CSLI, the collection of ALPR data is indiscriminate by design and captures images of every passing vehicle. ALPR data is retained and added to large databases regardless of whether the individual driving the vehicle is implicated in a crime or doing anything suspicious. In fact, only a tiny fraction of the location data collected is linked to any criminal activity.

In this case the surveillance network is vast and the volume of data retained within the government's databases is immense. The database created by that network currently contains datapoints from hundreds of millions of people who passed through Westchester County, regardless of whether they engaged in any wrongdoing. Furthermore, the search conducted in this case appears to have been run across the entire dataset of more than 1.6 billion ALPR records over a period of two years. Therefore, the search was not just of Mr. Zayas's location information—it was a search of *every record* from *every individual* in the database over a two-year period. In other words, the government searched the location data of hundreds of millions of

people who they had no reason to suspect of any crimes. They also stored this information, allowing them to continue to search this private information as long as they so desire.

Therefore, the ALPR data in this case, like the CSLI data in *Carpenter*, was collected and searched automatically and indiscriminately such that it "runs against everyone." *Id.*

### E.  The Inescapability of ALPR Surveillance

The location tracking here is also comprehensive in its reach because of the inescapable nature of this ALPR surveillance network. The reason for this is that ALPR networks like the CSLI tracking in Carpenter attach geolocation information to an essential element of modern society—driving.

Like cellphones, automobiles are, "indispensable to participation in modern society." *Id.* at 2210. Americans take 1.1 billion trips a day—four for every person in the U.S.[11] Eighty-seven percent of these daily trips take place in personal vehicles. Bureau of Transp. Stats., *supra* note 12. Forty-five percent of daily trips are taken for shopping and errands. *Id.* Twenty-seven percent of daily trips are for social and recreational purposes, such as visiting a friend. *Id.* Fifteen percent of them are taken for commuting to work. *Id.* On average 75.61% of Americans commute via motor vehicle- 67.82% drive alone in a personal vehicle.[12]

Vehicular travel is just as essential in Westchester County as in the rest of the nation. In New York State 77.2% of long-distance travel (50 miles or more one way) originating in the state was done in a personal use vehicle.[13]  These trips included everything from daily commutes

---

[11] Based on National Household Travel Survey, 2001-2002, *See Bureau of Transportation Statistics National Household Travel Survey Daily Travel Quick Facts*, (last updated May 31, 2017), https://www.bts.gov/statistical-products/surveys/national-household-travel-survey-daily-travel-quick-facts (last visited March 3, 2023).
[12] Bureau of Trans. and Stats., U.S. Dep't of Transp., *Commute Mode Year 2021*, https://www.bts.gov/browse-statistical-products-and-data/state-transportation-statistics/commute-mode (last visited March 3, 2023).
[13] CTR. FOR TRANSP. ANALYSIS, 2001 LONG DISTANCE TRAVEL IN NEW YORK STATE 3 tbl.1 (2005), https://www.dot.ny.gov/divisions/policy-and-strategy/darb/dai-unit/ttss/repository/Full%20LD%202001%20Results%20Report.pdf (last visited Feb. 16, 2023).

and business trips to vacation and visiting family. Ctr. for Transp. Analysis, *supra* note 14. In 2021, 55.16% of people in New York State commuted to work every day via personal motor vehicle. Bureau of Transp. Stats., *supra* note 13. In Westchester County, only 17.2% of people commute by train.[14]

The surveillance network here includes over 1.6 billion scans with the location data of everyone who passed through Westchester County—hundreds of millions of individuals. The actual reach of the network may be even larger than reported as the RTC participates in data-sharing with other local departments and has access to a national database containing an unknown number of records.[15]

Here, like the CSLI in *Carpenter* and the pole cameras in *Moore-Bush*, avoiding ALPR cameras theoretically possible. *See, e.g., Carpenter*, 138 S. Ct. at 2218; *United States v. Moore-Bush*, 36 F.4th 320, 338 (1st Cir. 2022). For example, one could forgo the use of a car altogether and rely solely on public transit. However, for many people that would virtually eliminate their constitutional right to travel. *See Kent v. Dulles*, 357 U.S. 116, 125 (1958) ("The right to travel is part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment"). For instance, those with compromised immune systems who should not travel on crowded trains or buses (especially during a pandemic), have no choice but to travel by car. And given the limited public transit available, even those without health issues often require a car to work, travel or socialize. Of course, if the cameras were visible and recognizable to the public, one could theoretically map out the hundreds of cameras and find a

---

[14] Westchester Cty. Dep't of Planning, *Commuting by Train*, https://planning.westchestergov.com/images/stories/Census/traincommute1317.pdf (last visited Feb. 16, 2023).
[15] RTC is also a part of the Rekor Public Safety Network ("RPSN") which shares ALPR data across every law enforcement agency enrolled in the network. *Rekor Systems Launches Public Safety Network*, https://www.bloomberg.com/press-releases/2019-08-21/rekor-systems-launches-public-safety-network (last visited Feb. 16, 2023).

path where the fixed cameras are not located. However, given the size of the network such a task would require months if not years of work to accomplish. Additionally, "the location of these cameras change frequently," so avoiding this vast network of LPR cameras is simply not feesible. *See Government Discovery Disclosure* at ¶ 13.

Given the vast nature of the ALPR network and the need to travel public highways to engage in modern life, avoiding ALPR surveillance is both unfeasible if impossible. Indeed, as with cellphones "[o]nly the few without [vehicles] could escape this tireless and absolute surveillance." *Carpenter*, 138 S. Ct. at 2218.

### F.  The Ability to Retrospectively Obtain Otherwise Unknowable Information

This search of this ALPR data violated Mr. Zayas's reasonable expectation of privacy because, like the CSLI in *Carpenter*, it allowed police to retrospectively track Mr. Zayas (and hundreds of millions of others) to learn information that would have been otherwise unknowable.

The Court in *Carpenter* noted that the "retrospective quality" of CSLI made it even more invasive than the type of location tracking in *Jones*. *Id.* This is because it "gives police access to a category of information otherwise unknowable." *Id.* The Court noted that "[i]n the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection. With access to CSLI, the Government can now travel back in time to retrace a person's whereabouts, subject only to the retention polices of the wireless carriers, which currently maintain records for up to five years.… Unlike with the GPS device in *Jones*, police need not even know in advance whether they want to follow a particular individual, or when. Whoever the suspect turns out to be, he has effectively been tailed every moment of every day for five years." *Id.*

14

Here, from law enforcement's perspective the primary utility of the ALPR data was its retrospective nature. At the outset of their investigation the government admittedly had no suspects—indeed they had no particular crime to investigate. Instead, they explicitly set out to look at the historic location records of everyone passing through Westchester County (and perhaps other locations) to identify those vehicles they considered to be exhibiting, "traffic patterns consistent with narcotics trafficking." *See Opposition to Motion to Dismiss*, at 2. To do this they looked two years into the past to examine who, if anyone, might fit their unknown parameters of suspicion.

This type of suspicionless collection of location data so that the government can, "call upon the results of that surveillance without regard to the constraints of the Fourth Amendment…" is exactly the type of "tireless and absolute and tireless surveillance" that lead the Court in *Carpenter* to find a reasonable expectation of privacy in a week's worth of CSLI. *Carpenter*, 138 S.Ct. at 2218. In this investigation the government did not suspect Mr. Zayas of a crime and surveil his vehicle to confirm their suspicions. They "called upon" a database of indiscriminately gathered information to retroactively traced his location on the chance it might produce something suspicious. This is far more concerning from a constitutional perspective than tracking the location of a single person for which the government has cause to believe committed a crime. This is a kind of mass surveillance unprecedented outside of the war on terror. *See e.g. Moalin*, 973 F.3d at 992-93 (finding bulk metadata collection likely unconstitutional, but denying suppression on the grounds that the collection did not taint the evidence introduced by the government at trial); *Klayman*, 957 F.Supp.2d 1 (granting a preliminary injunction on NSA's bulk metadata collection).

15

To examine the facts of this case against the "historical understandings 'of what was deemed an unreasonable search and seizure when [the Fourth Amendment] was adopted…'" *Carpenter*, 138 S. Ct. at 2213-2214 (citation omitted), is "almost impossible." *Jones*, 565 U.S. at 420, (Alito, J. concurring). To borrow from the analogy discussed in *Jones*: to achieve this level of surveillance in 1791 the government would have had to set up thousands of extremely focused, eagle-eyed constables, trained as scriveners and working in shifts around Westchester County recording everyone who passed. *See Jones*, 565 U.S. at 420 (Alito, J. concurring); *see also id.* at 407 n. 3.  Assuming the recording of everyone's travel through Westchester could be accomplished by this fastidious group of constables, thousands more would be required to pour over the records for months at a time to identify travel habits, they believed were suspicious. *See id.* This as would have been both "difficult and costly" such that "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—" *Carpenter,* 138 S.Ct. at 2217, track the travels of every citizen traveling the roads over a two-year period.

II.     **Prior ALPR Cases Are in Conflict with the Supreme Court's Holding in *Carpenter* and Are Distinguishable from the Dragnet Search Employed Here.**

There are a number of cases that have found that there is no reasonable expectation of privacy in data related to ALPR surveillance. *See e.g. United States v. Porter*, No. 21-CR-00087, 2022, 2022 WL 124563 (N.D. Ill. Jan. 13, 2022); *United States v. Brown*, No. 19 CR 949, 2021 WL 4963602 (N.D. Ill. Oct. 26, 2021); *United States v. Bowers,* No. 2:18-CR-00292-DWA, 2021 WL 4775977 (W.D. P.a. Oct. 11, 2021); *Commonwealth v. McCarthy*, 484 Mass. 493, 507 (2020); *United States v. Graham*, No. 21-645 (WJM), 2022 WL 4132488, at *5 (D.N.J. Sept. 12, 2022). However, these decisions are all distinguishable and contain several analytical errors that conflict with *Carpenter's* holding. First, they inappropriately apply antiquated law to cases

16

involving modern surveillance technology. Second, they treat the number of datapoints collected as dispositive while failing to consider the other factors considered by the Court in *Carpenter*. And they are distinguishable because none involved the type of suspicionless dragnet of extended periods of location information conducted in this case.

The first error in these cases is comparing a persistent and pervasive network of ALPRs to isolated observations of license plates and short-term tracking of vehicles. *See, e.g.*, *Brown*, 2021 WL 4963602, at *3 (first quoting *United States v. Miranda-Sotolongo*, 827 F.3d 663, 667-68 (7th Cir. 2016); and then quoting *Knotts*, 460 U.S. at 281); *Porter*, 2022 WL 124563, at *3 (citing *Knotts*, 460 U.S. at 281); *Bowers*, 2021 WL 4775977, at *3 (first citing *Knotts*, 460 U.S. at 281-82; and then quoting *United States v. Ellison*, 462 F.3d 557, 561-62 (6th Cir. 2006)). Although license plates are involved in the functioning of an ALPR surveillance system, the isolated reading of a license plate cannot be compared to the searching of years of location information belonging to hundreds of millions of people. *See supra* § A.

These comparisons represent the kind of "mechanical" application of old doctrine to new surveillance technologies that the Court has warned will leave society "at the mercy of advancing technology." *Carpenter,* 138 S. Ct. at 2214 (*quoting Kyllo*, 533 U.S. at 35); *see also Riley*, 573 U.S. at 393 (rejecting application of the search incident to arrest doctrine to cell phones found in an arrestee's possession); *Moore-Bush*, 36 F.4th at 338 (rejecting the application of prior pole camera and aerial observation law to eight months of video recordings of the curtilage of a home). Moreover, the Supreme Court has already rejected comparisons between the limited surveillance conducted in *Karo* and *Knotts* and the long-term tracking of vehicles and people. *Jones*, 565 U.S. at 419, 430, (Alito, J. concurring) ("Under this approach, relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that

17

our society has recognized as reasonable. But the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy."); *id.* at 415 (Sotomayor, J. concurring); *see also Knotts*, 460 U.S. at 284 ("[I]f such dragnet type law enforcement practices… should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable.").

The second error in these ALPR cases is their fixation with the number of location datapoints at issue. *See Brown*, 2021 WL 4963602, at \*3 ("The record contains about two dozen snapshots of a car on the streets over ten weeks . . . ."); *Bowers*, 2021 WL 4775977, at \*4 ("[T]he ALPR cameras in this case captured Defendant's license plate on 106 occasions in thirty-three unique public locations over a four-and-a-half-month period. This limited data collection does not even begin to approach the same degree of information as that gathered in *Carpenter*, nor does it otherwise implicate similar privacy concerns."); *United States v. Yang,* 958 F.3d 851, 863 (9th Cir. 2020) (Bea, J., concurring) (A single entry "[c]ontrasted with the nearly 13,000 unique data points—more than 100 per day—that the search of cell phone records in *Carpenter* revealed, it's not hard to see how that search infringed on Fourth Amendment rights while the search here did not."). While the number of location datapoints was considered by the Court in *Carpenter*, it was merely a single factor out of many. *See supra,* § B-F. In examining the nature of the surveillance technique employed *Carpenter* considered: the length of time covered; the level of detail of the location information; the automatic and indiscriminate collection; the inescapable nature of the technique; and the ability to retrospectively obtain otherwise unknowable information. *See id.* The analysis must focus on whether the surveillance is long-term and transcends ordinary police capabilities, or whether it is merely an "augmentation of

18

ordinary police capabilities," equivalent to "traditional, short-term surveillance." *Leaders*, 2 F.4th at 343-345. Thus, existence of gaps in the data or timeframe is not dispositive. *Id.,* at 342.

Finally, even if the Court were to find any of the decisions on ALPR databases compelling, none of them considered the way the instant ALPR surveillance network was leveraged here. *See, e.g., Porter*, 2022 WL 124563, at *1 (plate captured fleeing a bank robbery); *Brown*, 2021 WL 4963602, at *2 (partial plate obtained from an ALPR at the scene of the robbery); *Yang,* 958 F.3d, at 854 (plate caught on video camera while engaging in "fishing"); *United States v. Ruben*, 556 F.Supp.3d 1123 (N.D. Cal. 2021) (partial plate searched in ALPR database to determine full plate). Unlike those cases, which involved active investigations into identifiable crimes, the investigation into Mr. Zayas began with the dragnet surveillance of all drivers who passed through Westchester County over a period of two years. As detailed in the Government's motion papers, Mr. Zayas was not suspected of any crimes at all until the government began examining his travel habits over a two-year period and determined them to be "consistent with narcotics trafficking." *See Opposition to Motion to Dismiss*, at 1-2. This is the specter of modern surveillance that the Fourth Amendment must guard against in order to "assure [ ] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Carpenter*, 138 S. Ct at 2214 (*quoting Kyllo*, 533 U.S. at 34).

Furthermore, both the concurrence in *Yang* and majority in *McCarthy* recognized that while the limited use of the ALPR technology in those instances did not support a finding of a reasonable expectation of privacy, it was quite possible that future cases would support such a finding. *See Yang,* 958 F.3d at 864; *McCarthy*, 484 Mass. at 494. The concurrence in *Yang* explained that the single scan there was nowhere near the type of surveillance addressed in *Carpenter*. 958 F.3d at 863 (Bea, J., concurring).  However, the decision also noted "ALPRs may

in time present many of the same issues the Supreme Court highlighted in *Carpenter*. ALPRs can effortlessly, and automatically, create voluminous databases of vehicle location information." *Id.* Similarly, in *McCarthy* the Supreme Judicial Court of Massachusetts noted that the defendant's interest in the whole of his public movements "potentially could be implicated by the widespread use of ALPRs…." 484 Mass. at 494. The court explained that "[w]ith enough cameras in enough locations, the historic location data from an ALPR system in Massachusetts would invade a reasonable expectation of privacy and would constitute a search for constitutional purposes." *Id.* at 506. However, the court noted the record lacked any information regarding the number of records collected by the government, the scope of the search of those records, the number of cameras in the network, and the placement of those cameras. *Id.* at 504-09; *id.* at 515 (Gants, C.J. concurring). So, all that they were left to consider was the collection of data from four cameras at fixed locations on the ends of two bridges. *Id.* at 409.

The potential privacy concerns warned by the courts in *Yang* and *McCarthy* are manifest in the Westchester ALPR network. The RTC surveillance network includes 480 ALPR cameras—434 stationary systems and 46 mobile systems. *RTC FOIL Response*, at § 3(C).[16] Its cameras record video footage and utilize artificial intelligence to track and record the make, model, and color of the vehicles in addition to the plate number.[17] The system archives, approximately 16.2 million plates per week and retains that information for two years—creating a database of over 1.6 billion images of license plates belonging to anyone traveling through the area. *Id.* at § 3(B) & 4(A). This is not the collection of discrete data from four cameras at fixed locations on the ends of two bridges. *See McCarthy,* 484 Mass at 509. This is the systematic

---

[16] *See also, RTC: Westchester County, NY,* https://www.mobotix.com/en/lpr-westchester-county-ny (last visited March 3, 2023).

[17] See *RTC: Westchester County, NY, https://www.mobotix.com/en/lpr-westchester-county-ny (last visited March 3, 2023).*

20

development and deployment of a vast surveillance network that invades society's reasonable expectation of privacy.

The type of dragnet search conducted using the ALPR network here is more like the Baltimore "AIR program" than it is the common deployment of ALPR readers. *See e.g. Leaders,* 2 F.4th at 330.

The AIR program in Baltimore used aerial photography to track the movements of people and vehicles across the city. *Id.* at 334. To accomplish this, multiple planes mounted with camera technology known as the "Hawkeye Wide Area Imaging System" flew around the city at least 40 hours per week taking photos. *Id.* Photos were taken every second and each one covered 32 square miles. *Id.* Thereby the system captured roughly 90% of the city each day. *Id.* Each image displayed both people and vehicles as either blurred blobs or dots. *Id.* The planes then transmitted their photographs to "ground stations." *Id.* All of these images were retained for 45 days. *Id.* Although this system did not allow real-time tracking, upon an officer's request, contractors would prepare reports that tracked vehicles and people around the location of a crime both before and after the incident. *Id.* All the images and data related to each request were retained "indefinitely as necessary for legal proceedings and until relevant statutes of limitations expire." *Id.*

The government in *Leaders* attempted to distinguish *Carpenter* by explaining that the aerial surveillance program there did not target any particular citizen. *Id.* at 346. The court responded stating, "This does highlight an important distinction, but it cuts in the other direction. In *Carpenter*, service providers collected comprehensive location data from their subscribers. As Defendants point out, the government's only role was to request that data as to specific investigations. Under the AIR program, the government does both. The government continuously

21

records public movements. Then, the government—once officers know where (and when) to look—tracks movements related to specific investigations. Only by harvesting location data from the entire population could BPD ultimately separate the wheat from the chaff." *Id.* at 347. The court also dismissed comparisons to "aerial surveillance methods" in part because "those cases all involve some discrete operation surveilling individual targets." *Id.* at 345. They noted that the plaintiffs were not objecting to the use of aerial photography—their challenge was to the creation and use of "a retrospective database of everyone's movements across the city." *Id.*

The challenge here is similarly not about a single image or license plate observation. It is to the search of a surveillance network that allows the retrospective tracking of everyone's movements across Westchester County. The government here was not engaged in a targeted investigation into Mr. Zayas, his car, or any particular crime. Instead, the government harvested the public movements of the entire population and then searched them to analyze traffic patterns they believed were "consistent with narcotics trafficking."

Ultimately in *Leaders,* the court concluded: "The AIR program records the movements of a city. With analysis, it can reveal where individuals come and go over an extended period. Because the AIR program enables police to deduce from the whole of individuals' movements, we hold that accessing its data is a search, and its warrantless operation violates the Fourth Amendment." *Id.* at 346. The same is true here. Accessing years of historical location information harvested by the ALPR network allowed police to deduce what they were otherwise incapable of knowing: that Mr. Zayas's travel habits were "consistent with narcotics trafficking." Therefore, it was a search, and its warrantless operation violated the Fourth Amendment.

The surveillance program here, even more so than the AIR program in *Leaders*, is "a 21st century general search, enabling the police to collect all movements, both innocent and

22

suspected, without any burden to 'articulate an adequate reason to search for specific items related to specific crimes.'" *Id.* at 347 (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 560 (2012) (Sotomayor, J., dissenting). "Allowing the police to wield this power unchecked is anathema to the values enshrined in our Fourth Amendment." *Id.* Therefore, if this court is to uphold the "central aim" of the Fourth Amendment it must "place obstacles in the way of a too permeating police surveillance[]" and require judicial oversight. *Carpenter*, 138 S. Ct. at 2214, (quoting *Di Re*, 332 U.S. at 595).

### III.    The Search of Mr. Zayas's Historical Location Records Required a Warrant

A warrant was required in this case because the government searched Mr. Zayas's historical location records for a period of two years.

Accessing and querying large quantities of location data is a Fourth Amendment search requiring a warrant. *See Jones*, 565 U.S. at 415–16 (Sotomayor, J., concurring); *id.* at 429–31 (Alito, J., concurring); see *also Leaders*, 2 F.4th at 346 ("[W]e hold that accessing its data is a search, and its warrantless operation violates the Fourth Amendment."); *United States v. Chatrie*, 590 F. Supp. 3d 901, 925 (E.D. Va. 2022) (denying suppression where police relied in good faith on a warrant, but noting a "deep concern" about the querying of large databases of geolocation information.); *Moore-Bush*, 36 F.4th at 341 ("[T]he government did conduct a Fourth Amendment 'search' when it accessed the digital video record that law enforcement had created over the course of the eight months in question, notwithstanding the government's contention that the record itself is merely a compendium of images of what had been exposed to public view.").

Furthermore, the nature of the initial query and its implications for privacy demonstrate a need for judicial oversight of ALPR searches. Here law enforcement, based on their "training

23

and experience," determined that quick trips to New York City, the largest city in the country, were indicative of narcotics trafficking such that they should initiate an investigation into the driver.[18] This was based on the officer's training and experience "that narcotics traffickers travel large distances to conduct a transaction and return quickly to their origin city…." However, there are many reasons that people may travel large distances for short periods of time. For example, a lawyer may travel long distances for a brief court appearance. A patient may travel long distances for an appointment with a specialist. A reporter may meet briefly with a distant source. Furthermore, while some interstate narcotics travelers may take long trips over short periods of time- others clearly do not. It is not unusual for interstate narcotics traffickers to have locations in multiple states where they stay for extended periods of time. This is necessary for building up and monitoring criminal networks in multiple locations. In other words, the officer's conclusion and subsequent search is obviously both underinclusive and overinclusive. However, based on nothing more than his own subjective beliefs he decided that he could search the travel patterns of everyone who has traveled through Westchester County over the course of years. With no judicial oversight this type of system operates at the caprice of every officer with access to it.

"Allowing the police to wield this power unchecked is anathema to the values enshrined in our Fourth Amendment." *Leaders,* 2 F.4th at 347. Furthermore, requiring a warrant would not eliminate the availability of such surveillance techniques to law enforcement, it merely emphasizes "that the role of the warrant requirement remains unchanged as new search capabilities arise. *Id.* Therefore, the search of two years of ALPR location records belonging to hundreds of millions of drivers required a warrant.

---

[18] Although defense is not in possession of the initial query that demonstrated the Chevrolet Equinox with MA 3CD192 was "exhibiting travel patterns consistent with interstate narcotics trafficking," it is clear from discovery and assertions by the government that it was based on short turnaround times of two prior trips. *See Opposition to Motion to Dismiss*, at 2.

## **CONCLUSION**

"[P]eople have a reasonable expectation of privacy that is violated when the Government, without any basis whatsoever to suspect them of any wrongdoing, collects, and stores for… years their [location information] for purposes of subjecting it to high-tech querying and analysis without any case-by-case judicial approval." *Klayman*, 957 F.Supp.2d at 37. Thus, the suspicionless collection and mining of the location data of Mr. Zayas and all people passing through Westchester County over a period of two years was a warrantless search and a violation of the Fourth Amendment. Therefore, all contraband and evidence resulting from the subsequent stop and search of his car must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).


Dated:  March 3, 2023                                    Respectfully Submitted,
           White Plains, New York

                                                         /s/_____

                                                         Benjamin Gold
                                                         Assistant Federal Defender
                                                         Federal Defenders of New York
                                                         81 Main Street, Suite 300
                                                         White Plains, New York 10601

                                                         Sidney Thaxter
                                                         Senior Litigator, 4th Amendment Center
                                                         NACDL
                                                         1660 L. St. NW, 12th Floor
                                                         Washington DC 20036

                                                         Attorneys for DAVID ZAYAS

25