1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------------x

3  UNITED STATES of AMERICA,

4          -against-                    22 CR 178 (NSR)
                                        EVIDENTIARY HEARING
5
   DAVID ZAYAS,
6
                        Defendant.
7
   ------------------------------------x
8
                                   United States Courthouse
9                                  White Plains, New York
10                                 March 22, 2023

11

12 B e f o r e:  THE HONORABLE NELSON S. ROMÁN,
                                District Judge
13

14
   DAMIAN WILLIAMS
15      United States Attorney for
        the Southern District of New York
16 T. JOSIAH PERTZ
   MARGERY FEINZIG
17          Assistant United States Attorneys

18

19 FEDERAL DEFENDERS OF NEW YORK INC.
            Attorneys for David Zayas
20 BENJAMIN D. GOLD
   SIDNEY THAXTER
21

22

23

24

25

1          THE DEPUTY CLERK:  Your Honor, may I call the case.

2          THE COURT:  Yes.

3          THE DEPUTY CLERK:  Docket Number 22CR178, United

4    States of America versus David Zayas.

5          Will counsel please state their appearance for the

6    record, beginning with the government.

7          MR. PERTZ:  Good morning, your Honor.  Josiah Pertz

8    for the government.  Here with me at counsel table, AUSA

9    Margery Feinzig, HSI Special Agent Michael Flanagan, legal

10   assistant from the US Attorney's office, Allison Tull.

11         THE COURT:  Good morning.

12         MR. GOLD:  And good morning, your Honor.  Ben Gold

13   from the Federal Defenders on behalf of Mr. Zayas, who's

14   sitting right next to me, and behind Mr. Zayas is Sydney

15   Thaxter, who put in a notice of appearance about a month ago.

16         THE COURT:  All right.  This matter was put down for

17   a hearing with respect to the justification of the car stop in

18   this matter.

19         Are we ready to proceed?

20         MR. PERTZ:  Yes, your Honor.

21         THE COURT:  All right.  Who's your first witness?

22         MR. PERTZ:  The government calls Westchester County

23   Police Department Officer David DiRienzo.

24         THE COURT:  Gina, if you could swear him in.

25

DiRienzo - Direct - Pertz

1   DAVID DiRIENZO,

2       called as a witness by the Government,

3       having been duly sworn, testified as follows:

4               THE DEPUTY CLERK:  Please state your full name for

5   the record and spell your name.

6               THE WITNESS:  Sure.  David, middle initial V,

7   DiRienzo last name, D-I-R-I-E-N-Z-O, capital R.

8               THE COURT:  All right.  Good morning, Officer.

9   You're going to be asked a set of questions.  Listen to the

10  question that's asked, try and answer only the question that's

11  asked.  If you do not understand the question, let us know,

12  we'll try and have the question rephrased.  If there's an

13  objection, you must wait until I rule on the objection before

14  proceeding, okay?

15              THE WITNESS:  Thank you, your Honor.

16              THE COURT:  All right, let's begin.

17              MR. PERTZ:  Thank you, your Honor.

18  DIRECT EXAMINATION

19  BY MR. PERTZ:

20  Q    Good morning, Officer DiRienzo.

21  A    Good morning.

22  Q    Where do you work?

23  A    I work for the Westchester County Police Department.

24  Q    How long have you worked there?

25  A    I worked for them since June of 2015.

DiRienzo - Direct - Pertz

1   Q      What's your title?

2   A      I'm a police officer.

3   Q      How long have you been a police officer?

4   A      Little over 15 years now.

5   Q      Where did you work before Westchester County Police?

6   A      I worked for the Village of Mount Kisco Police Department.

7   Q      How did you come to work for Westchester County Police?

8   A      The Westchester County and the Village of Mount Kisco

9   entered a memorandum of agreement where Westchester County took

10  over police services for the Village of Mount Kisco and we

11  merged together.

12  Q      What are your duties and responsibilities as an officer

13  with WCPD?

14  A      So we enforce all local vehicle and traffic laws, penal

15  law, criminal procedure law, and monitor roadways and answer

16  calls for service on the roadways that we protect.

17  Q      Are you part of a particular unit?

18  A      Yes, I work in the conditions unit.

19  Q      What is the conditions unit?

20  A      We focus on criminal highway interdiction, including drug

21  trafficking, money laundering, criminal possession of weapons,

22  stolen vehicles, and also we primarily respond to any crime on

23  the Bee-Line Bus system throughout Westchester County.

24  Q      Have you personally investigated those types of crimes?

25  A      Yes.

DiRienzo - Direct - Pertz

1    Q    With respect to the narcotics trafficking in particular,

2    approximately how long have you investigated that crime?

3              MR. GOLD:  Objection, your Honor.  Scope.  Relevance.

4              THE COURT:  This is all background information.  I'll

5    allow it.

6    A    Full-time since 2018.

7    Q    What type of training have you received in investigating

8    narcotics trafficking crimes?

9    A    Hundreds of hours, including deception detection,

10   interview interrogation, hidden compartment training and

11   locating, et cetera.

12   Q    And who have the providers been of that training?

13   A     It's various.  Sometimes held by New York State, either

14   the Department of Criminal Justice Services or a local entity

15   in the state, federal partners, DEA, Homeland Security, FBI.

16   Or sometimes they also contract out to private entities that do

17   the classes.

18   Q    Do you do traffic patrols?

19   A    Yes.

20   Q    Have you received training in traffic patrolling?

21   A    Yes.

22   Q    What kind of training?

23   A    So I attended the Westchester County Police Academy, 125th

24   session.  You get your basic -- it's your basic police officer

25   training, and you get taught how to conduct traffic stops and

DiRienzo - Direct - Pertz

1   enforce vehicle and traffic law violations.

2   Q    What kind of experience do you have in enforcing the

3   traffic law?

4   A    So I've made thousands of traffic stops dating back

5   including local town and village area and including now since

6   2015 on the parkways and interstates throughout Westchester

7   County.

8   Q    What are some of the highways that you've patrolled with

9   WCPD?

10  A    So it includes pretty much any and all parkways in

11  Westchester, including Cross County Parkway, the Hutchinson

12  River Parkway, Bronx River Parkway, Saw Mill Parkway.

13  Q    What kind of crimes have you investigated while patrolling

14  those particular highways?

15  A    So pretty much any and all:  Criminal possession of

16  controlled substances; criminal possession of a weapon;

17  criminal possession of stolen property; all misdemeanor and

18  felony vehicle and traffic law crimes; and then a multitude of

19  other penal law crimes, misdemeanor and felony.

20  Q    Approximately how often do you make a traffic stop on the

21  Cross County Parkway?

22  A    Several times a month.

23  Q    Do you have a partner?

24  A    I do.

25  Q    Who is that?

DiRienzo - Direct - Pertz

1   A    She is -- her name is Liberty.  She's my narcotics

2   detection K9.

3   Q    Does Liberty travel with you?

4   A    Yes, she's with me 24/7 pretty much.  She's assigned to me

5   at work and also she comes home with me.

6   Q    Why does she accompany you during your work?

7   A    So any time that either the patrol officers need or I'm

8   engaged into a traffic stop where we need the use of narcotics

9   detection K9.  We also mutual aide services to any and all

10  villages and towns in the county and other counties along with

11  federal partners; HSI, DEA, FBI.

12  Q    While you were on patrol on the highway, do you sometimes

13  receive alerts?

14  A    Yes.

15  Q    What kinds of alerts are these?

16  A    So they're alerts that -- there's a license plate reader

17  system throughout Westchester County with a screen on our

18  computer in the car.  And they'll be for a variety of things:

19  Missing people; people that are in immediate of medical

20  attention that are either lost or not able to be located;

21  stolen vehicles; vehicles that are involved in other criminal

22  activity, including robberies, shot's fired, larcenies, and

23  narcotics trafficking.

24  Q    What is it that happens when you get an alert?  You just

25  mentioned a little bit about the screen.  Tell us a little bit

DiRienzo - Direct - Pertz

1  more about that.

2  A    So depending on the vehicle and what it's alerting for,

3  again, any of those possibilities.  There's also terrorist

4  activity that we'll get alerted to.  Depends on where the

5  vehicle hits, it will give you the location where it was hit on

6  the LPR system, usually a picture of the vehicle, the license

7  plate, direction of travel, the time it hit.  And it will give

8  a description of what type of vehicle it is believed to be,

9  like a green Chevy or whatever is applicable there.  And then

10  it also gives you a very brief description of what the vehicle

11  is wanted for.

12  Q    You mentioned an LPR system.  What does LPR stand for?

13  A    So it's commonly known as a license plate reader.

14  Q    What is an LPR system?

15  A    So it's the system -- it's OpenALPR is the name of the

16  system throughout Westchester County, or one of them at least,

17  and that's -- it's a combination of all license plate readers

18  and our Realtime Crime Center manages that.

19  Q    Are you the only one who gets these alerts or do other

20  officers get the alerts as well?

21  A    Other officers get the alerts.

22  Q    Who sends them?

23  A    The Westchester County Realtime Crime Center Intelligence

24  Unit.

25  Q    What do you typically do when you get an alert?

DiRienzo - Direct - Pertz

1   A    So obviously, you can look at it.  See if it's something

2   that's relevant, if it's something that you're able to respond

3   to or locate.

4   Q    Do you stop every car you get an alert for?

5   A    No.

6   Q    Do you search every single car you stop based on an alert?

7   A    No.

8   Q    What factors would you consider when you decide to stop a

9   car?

10  A    So depending on, again, the type of vehicle, what it's

11  wanted for, what it's involved in, it will come a factor

12  violations of the New York State Vehicle and Traffic Law, if

13  there's a reaction to the driver -- driver reaction to the

14  presence of law enforcement, and stuff along those lines.

15  Q    I'd like to turn your attention to March 10, 2022.  Were

16  you working that day?

17  A    I was.

18  Q    Where were you working?

19  A    I was working on the lower end of the county in the area

20  of the Cross County Parkway.

21  Q    Who were you with?

22  A    My partner, K9 Liberty.

23  Q    Turning your attention to approximately 2:42 p.m. that

24  day, what, if anything, happened at that point?

25  A    So the Westchester County Realtime Crime Intelligence Unit

DiRienzo - Direct - Pertz

1  had an alert that was put out on the system indicating a

2  vehicle that was believed to be involved in narcotics activity,

3  was traveling southbound on the Hutchinson River Parkway from

4  the area of Scarsdale.

5  Q    Tell us what form the alert was in.

6  A    It was a pop-up alert on the screen of the computer.

7  Q    What kind of information did it convey?

8  A    Picture of the vehicle, the license plate, time it hit the

9  license plate reader, direction of travel, the description of

10 what type of vehicle it is, and also description of what the

11 vehicle was involved in or alerted for.

12 Q    Did it list the location of the LPR --

13 A    Yes, it did.

14 Q    -- hit?

15      What was that location?

16 A    The Hutchinson River Parkway, southbound, at the

17 Mamaroneck Road Bridge.

18 Q    And what was the alert for?  What kind of crime did it say

19 the alert was for?

20 A    It was a vehicle that was believed to be involved in

21 narcotics activity.

22 Q    Turning your attention to 2:48 p.m., what happened then?

23 A    So at that point I was sitting or parked stationary on the

24 Cross County Parkway westbound in the area of the North

25 Columbus Avenue exit and monitoring traffic.  At that point, I

DiRienzo - Direct - Pertz

1  observed the vehicle, Massachusetts registration vehicle

2  traveling westbound.  I was in the left lane.  Made two abrupt,

3  unsafe lane changes from the left lane to the right lane, and

4  also not signaling each turn or each lane change itself, and

5  got into the right travel lane.

6          THE COURT:  All right, slow down just a bit.

7          So 2:48 p.m. you're sitting where?

8          THE WITNESS:  I'm on the Cross County Parkway

9  westbound at the North Columbus exit.

10          THE COURT:  Is that the shoulder or the median and to

11  left?

12          THE WITNESS:  So it's on the right side.  So it's on

13  the exit side, there's a big grassy area, I'm sorry, off the

14  shoulder.

15          THE COURT:  Okay.  And from that position, what

16  direction were you looking at?

17          THE WITNESS:  So I was facing -- so that would be at

18  that point west -- so I was facing south.  So my vehicle was

19  facing the parkway, the three lanes on the parkway observing

20  the traffic as it approached, and as it goes past me,

21  continuing westbound.

22          THE COURT:  When you first saw the vehicle, in what

23  lane was the vehicle?

24          THE WITNESS:  The left lane.

25          THE COURT:  Is that the lane closest to you or

DiRienzo - Direct - Pertz

1    farthest from you?

2              THE WITNESS:  Further but -- so it actually turns

3    into four lanes there because of the merge from the Hutchinson

4    Parkway north, so it's -- so I'd say it's a third lane.

5              THE COURT:  Okay.  And what did you do once you

6    observed the vehicle?

7              And this vehicle matches the alert you received?

8              THE WITNESS:  Yes, your Honor.

9              THE COURT:  What did you do when you first observed

10   the vehicle?

11             THE WITNESS:  So I watched it as it drove past me,

12   and as it drove past me, I pulled out onto the westbound Cross

13   County and began to follow it.

14             THE COURT:  Are you in a marked vehicle or an

15   unmarked vehicle?

16             THE WITNESS:  It's a low profile.  It's unmarked.

17   There's a push bumper on it, but no markings on the outside.

18             THE COURT:  What color vehicle is your vehicle?

19             THE WITNESS:  It's navy blue, similar to the New York

20   State Police blue.

21             THE COURT:  What kind of car?

22             THE WITNESS:  Ford Explorer.

23             THE COURT:  Okay.  So for how long did you follow

24   this vehicle?

25             THE WITNESS:  So a very short period of time, I'd say

DiRienzo - Direct - Pertz

1    under a minute, because the vehicle was now in the right lane,

2    which is the exit lane for the Bronx River and Sprain Brook

3    Parkway north and south exit.  At that time of the day it

4    starts backing up significantly, so I ended up passing it.

5         THE COURT:  Okay.  All right.  You can continue.

6    BY MR. PERTZ:

7    Q    After you passed the car, what happened next?

8    A    So due to the reaction that I observed and the vehicle and

9    traffic law violations, I ended up pulling over on the

10   westbound Cross County in the area of Kimball Avenue, which is

11   a short distance after the Bronx River exit lane, and again,

12   onto the right side of the road there's a grassy exit area.  I

13   sat in that area waiting to see if the vehicle continued to

14   travel westbound, or if it didn't, which would have indicated

15   he got off the Bronx River or the Sprain.

16        THE COURT:  Can you take a step back?

17        THE WITNESS:  Yes, sir.

18        THE COURT:  What is the first time -- you said you

19   observed him do a change lane?

20        THE WITNESS:  Yes, two unsafe lane changes.

21        THE COURT:  Why were they unsafe?

22        THE WITNESS:  Due to the traffic conditions and the

23   speed that he was going.  It was just unsafe for that time.

24   There's a high amount of traffic due to the --

25        THE COURT:  All right, what do you mean by that?

DiRienzo - Direct - Pertz

1   Because I don't know what an unsafe lane change is.  So explain
2   to me what an unsafe lane change is.
3           THE WITNESS:  Yes, your Honor.
4           So the vehicle is in that third lane.  There's
5   traffic.  It immediately makes the change into the middle and
6   then right lane without stopping, and also not signaling its
7   turn notifying the drivers and the traffic that it's going to
8   be making those lane changes.
9           THE COURT:  So there was no signaling.
10          THE WITNESS:  Either change, from the left to the
11  middle, or middle to the right, no signal, and they were in
12  basically one motion with traffic.
13          THE COURT:  And is there a vehicle and traffic law
14  that requires them to signal when he changes lane?
15          THE WITNESS:  Yes, there is.  And also there's a
16  vehicle and traffic law for unsafe lane change.
17          THE COURT:  So the vehicle did not signal when it
18  went from the left lane to the middle and from the middle to
19  the right lane?
20          THE WITNESS:  Correct.
21          THE COURT:  You said it was unsafe.  Besides it not
22  signaling, you say it was unsafe.  Why was it unsafe?
23          THE WITNESS:  So including the not signaling and
24  letting the traffic -- there's a lot of traffic there --
25  letting them know you're making that change.  The amount of

DiRienzo - Direct - Pertz

1    traffic and the distance between the vehicles, it wasn't

2    something that you could safely do without causing people to

3    stop short and potentially cause rubbernecking and traffic

4    accidents.

5              THE COURT:  All right.  Can you give me more details

6    about the distances between the cars?

7              THE WITNESS:  All I can remember, your Honor, is that

8    there was very little distance, and in my training and

9    experience and the traffic stops and observing traffic, it was

10   unsafe lane change.

11             THE COURT:  All right.  You can continue.

12   BY MR. PERTZ:

13   Q    When you saw the Equinox the second time, you were pulled

14   over on the side of the road, right?

15   A    Correct.

16   Q    What happened after you saw it that second time?

17   A    So, again, he was, the operator of the Equinox was in the

18   right lane at this point.  It made an immediate lane change to

19   the middle, and then to the left lane again.  Again, without

20   signaling and continued westbound on the Cross County Parkway.

21   Q    What did you do?

22   A    I pulled out and followed it.

23   Q    And what happened when you followed it?

24   A    So as I was following it, I was maintaining a speed, a

25   steady spread of 63 miles an hour.  I paced the vehicle, the

DiRienzo - Direct - Pertz

1   method of radar and acquisition of vehicle speed, following it

2   up until approximately the Seminary Avenue-Murray Avenue

3   bridges.

4   Q    What does it mean to pace a car?

5   A    So you basically are behind a vehicle, or any vehicle

6   that's in front of you.  You're at a set speed in your vehicle,

7   and as you travel, you're not closing in or losing any

8   distance, you're maintaining the same distance between the

9   vehicle that's in front of you, and you're seeing if that

10  vehicle was doing the same or very similar speed to what you're

11  traveling.

12  Q    That's what you did with the Equinox.

13  A    Correct.

14  Q    What speed were you traveling as you pacing the Equinox?

15  A    63 miles an hour.

16  Q    Based on that pacing, do you have a conclusion as to what

17  speed the Equinox was going at the time?

18  A    Yes, approximately 63 miles an hour.

19  Q    What was the speed limit at the time you were pacing the

20  Equinox at 63 miles an hour?

21  A    45 miles per hour.

22  Q    After you were pacing it -- oh, sorry.  Approximately how

23  long did you pace the Equinox?

24  A    Approximately a third of a mile -- third to a half mile.

25  Q    And what did you do next?

DiRienzo - Direct - Pertz

1   A    The Equinox then changed lanes from the middle lane to the

2   right lane and continued to pass vehicles on the right.  I

3   activated my emergency lights and siren and affected a traffic

4   stop.

5   Q    Based on what you witnessed, did you write a report?

6   A    I did.

7   Q    When did you begin preparing that report?

8   A    On scene.

9   Q    In the report, did you allege that violations of New York

10  State Vehicle and Traffic Law had been committed?

11  A    Yes.

12          MR. PERTZ:  Could we please have Government Exhibit 1

13  on the screen.

14          THE COURT:  Before we put the exhibit --

15          You can continue.

16          This exhibit is admitted into evidence on consent?

17          MR. PERTZ:  It's not yet.

18          THE COURT:  Oh.

19          MR. PERTZ:  There are -- oh, unless maybe there

20  are --

21          THE COURT:  I thought there was a stipulation with

22  respect to certain exhibits.

23          MR. PERTZ:  Correct.  3, 4, and 5 there will be

24  exhibits --

25          THE COURT:  3, 4 and 5.  Not Exhibit No. No. 1?

DiRienzo - Direct - Pertz

1          MR. PERTZ:  Not yet.

2          THE COURT:  So we have Exhibit No. 1 it's being -- do

3   you have a copy for the witness?

4          MR. PERTZ:  We do.

5          THE COURT:  All right.  Let's show it to the witness

6   before it gets put on the screen.

7          All right.  Government Exhibit No. 1 consists of how

8   many pages?

9   BY MR. PERTZ:

10  Q    Officer DiRienzo, how many pages does the exhibit have?

11  When you're ready.

12  A    On there's a total of -- sorry.  There's a total of seven

13  pages, your Honor.

14         THE COURT:  Okay.

15  Q    Officer DiRienzo, do you recognize Exhibit 1?

16  A    Yes.

17  Q    What is it?

18  A    This is one of the reports, it's the case report that I

19  generated that day.

20  Q    Is it a fair and accurate copy of that report?

21  A    Yes, from what I can tell.

22  Q    And this was the report that you mentioned that you

23  started at the scene?

24  A    Correct.

25         MR. PERTZ:  At this point, the government offers

DiRienzo - Direct - Pertz

1    Exhibit 1.

2              THE COURT:  Any objection?

3              MR. GOLD:  I guess I do object.  I'm not sure the

4    relevance of a report that just sort of repeats this

5    person's -- sorry, the officer's testimony, so I don't see why

6    this hearsay document comes in.

7              THE COURT:  All right.  What's the basis for the

8    objection?

9              MR. GOLD:  I don't think this is -- I don't think

10   they have established why this --

11             THE COURT:  You're saying relevancy?

12             MR. GOLD:  Correct.  And relevancy, yes.

13             THE COURT:  Relevancy and hearsay?

14             MR. GOLD:  Correct.

15             THE COURT:  All right.  So hearsay is not admissible

16   at these hearings?

17             MR. GOLD:  I think it's cumulative and unnecessary.

18             It also encompasses a large amount of details that

19   are well beyond the scope of this hearing.

20             THE COURT:  On what basis is the document being

21   offered?

22             MR. PERTZ:  It's a very limited basis, your Honor,

23   and that's to show that some of the details which the officer

24   recounted here today he memorialized very soon after having

25   observed them.  The government concedes that this exhibit does

DiRienzo - Direct - Pertz

1    not have great weight.  It is the kind of thing that we might

2    not otherwise put in, but in the interest of giving the Court

3    as much information as we can, we've offered it.

4              THE COURT:  I'll sustain the objection.  All right?

5              MR. GOLD:  Thank you.

6    BY MR. PERTZ:

7    Q    Officer DiRienzo, I'll take the report back.

8              THE COURT:  He can have it.  He can hold it in case

9    he may need to reference it or refresh his recollection.

10             MR. PERTZ:  All right.

11             THE COURT:  You just can't testify from that.

12             MR. PERTZ:  Fair enough.

13   BY MR. PERTZ:

14   Q    Officer DiRienzo, in preparation for this hearing, have

15   you revisited the area where you saw the Equinox?

16   A    Yes, I have.

17   Q    Did you retrace the route that you took when following it?

18   A    I did.

19   Q    Did you do that in your police vehicle?

20   A    I did.

21   Q    Did you make a video of yourself driving the route?

22   A    Correct, I did.

23             MR. PERTZ:  At this point, I would like to bring up

24   what has been marked Government Exhibit 2.

25             Now, we'd like to offer this exhibit, Government

DiRienzo - Direct - Pertz

1    Exhibit 2, which has been marked and produced to the defense

2    and the Court.

3              MR. GOLD:  And I have no objection about this

4    exhibit.

5              THE COURT:  All right.  Government Exhibit 2 is

6    deemed marked in evidence without objection.

7    Q    Officer DiRienzo, what time of day was it when you made

8    this video?

9    A    I believe it was around 2:00 o'clock.

10   Q    What time of year was it?

11   A    It was a week and a half -- about a week and a half ago.

12   The same -- in March.

13   Q    What day of the week?

14   A    I believe it was Tuesday.

15   Q    In the video we're about to see, is the road's physical

16   condition generally the same as it was on March 10th, 2022?

17   A    Yes.

18   Q    How did the traffic volume compare?

19   A    It was lighter than normal.

20   Q    Lighter than normal?

21   A    I'm sorry.  Lighter than the day of the traffic stop of

22   the Equinox.

23   Q    So when you took the video, this video, the traffic was

24   lighter than on March 10, 2022?

25   A    Yes.  It was also earlier in the day.

DiRienzo - Direct - Pertz

1          MR. PERTZ:  If we could play the video, please,

2    Ms. Tull.

3          And this is playing from 00 in the video.

4          (Videotape played)

5    Q    Officer DiRienzo, what are we looking at now?

6    A    This is me operating my vehicle traveling southbound on

7    the Hutchinson River Parkway, approaching Mamaroneck Avenue --

8    correction, Mamaroneck Road Bridge.

9          That's the Mamaroneck Road exit southbound.

10         MR. PERTZ:  If we could pause.

11   Q    What is the timestamp, please?

12   A    Me?

13   Q    Oh, no, I guess you can't see, but I'll take a look.

14         MR. PERTZ:  May the record reflect the Mamaroneck

15   Bridge appears at 32 seconds into the video.

16   Q    What is notable, if anything, about the Mamaroneck Bridge?

17   A    So the Mamaroneck Road Bridge is the location of one of

18   the license plate readers in the county.

19   Q    And is that the license plate reader that hit the Equinox

20   on March 10, 2022?

21   A    Yes.

22         MR. PERTZ:  If we could please skip forward to minute

23   7:13, so 7 minutes and 13 seconds in the video.

24         (Videotape played)

25   Q    Officer DiRienzo, what do you see at this point?

DiRienzo - Direct - Pertz

1  A    This is the Cross County Parkway, westbound set of lanes,

2  and it's the North Columbus Exit.

3  Q    What was going on at this spot on March 10, 2022, when you

4  were there?

5  A    So I was parked facing the roadway.  In the video you

6  could see there now is a message board, one of the variable

7  message sign boards, just past the green exit sign.  And I was

8  parked in that general vicinity right by the shoulder and the

9  curb area facing traffic as it continued westbound on the Cross

10 County Parkway.

11 Q    That was at approximately 2:42 p.m.?

12 A    Yes.

13 Q    And this is the moment when you first saw the Equinox?

14 A    Yes.

15 Q    Why was it you were parked in this particular spot?

16 A    It gives -- for how we operate and watch for driver

17 reaction and driver behavior, it gives a clear view of the

18 roadway and it allows traveling vehicles to see the police car

19 watching the roadway.

20         MR. PERTZ:  If we could please continue, Ms. Tull.

21         (Videotape played)

22 Q    Now, what's happening here, Officer DiRienzo?

23 A    So I'm continuing westbound on the Cross County.  This

24 right lane is going to be the lane for the Bronx River Parkway

25 and Sprain Brook Parkway exits.  I'm in the middle lane.

DiRienzo - Direct - Pertz

1  Q    What was happening at this point as you were driving this

2  on March 10, 2022?

3  A    The Equinox was in that right lane, actually, as that

4  police car, the marked police car is, and traffic is backing up

5  actually further back than where we are now.

6       I passed the vehicle as we got in the vicinity of --

7  that's the Gramatan Avenue overpass, in the area of the

8  Gramatan Avenue overpass.

9  Q    So at this point where we're looking at in the video, you

10 have now passed the Equinox?

11 A    Yes.

12 Q    And you're driving on?

13 A    Yes, continuing westbound on the Cross County Parkway.

14       MR. PERTZ:  If we could continue playing the video

15 through minute 8 and 59 seconds.

16       (Videotape played)

17 Q    At any point in this stretch of video, does the Equinox

18 pass you again?

19 A    Not until I get up to the Kimball Avenue exit, which is

20 this exit approaching.

21       THE COURT:  What happens at the Kimball Avenue exit?

22       THE WITNESS:  So right here I'm parked again on that

23 shoulder of the road, and the Equinox, a short time later after

24 it passed earlier, it passes me again continuing westbound.

25       MR. PERTZ:  May the record reflect we are now paused

DiRienzo - Direct - Pertz

1  at 8 minutes 59 seconds.

2  Q    Now, at this point you have pulled over again?

3  A    I was pulled over, yes, on that right shoulder grass,

4  triangle area.

5  Q    All right.  It's approximately here that the Equinox

6  passes you?

7  A    Yes.

8  Q    What do you do next?

9  A    That's when I pull out after it and followed it and

10 started conducting pace radar on it.

11 Q    All right.

12       MR. PERTZ:  I'll ask that the video be restarted,

13 please.

14 Q    And you can just tell us when you stop pacing him.

15 A    Okay.

16       (Videotape played)

17 Q    At this point as the video is continuing, are you pacing

18 the car?

19 A    Yes.

20 Q    Are you going approximately 63 miles an hour at this

21 point?

22 A    Yes.  Approximately this area.

23       MR. PERTZ:  Could we pause, please.

24 Q    At approximately 10 minutes and 2 seconds.

25       Bless you.

DiRienzo - Direct - Pertz

1    A    Thank you.

2    Q    At approximately 10 minutes and 2 seconds you have

3    initiated the traffic stop; is that right?

4    A    Just a short distance after this location.

5         THE COURT:  What exit is that?

6         THE WITNESS:  So right now this is where the Cross

7    County is going to split, Yonkers Avenue proper exit, which is

8    the right lane, and then another right lane will appear from

9    the onramp, and those two lanes are exit only.  And the two

10   left lanes -- so I'm in the right lane, the two left lanes, the

11   middle and the left lane are the exits for the Saw Mill north

12   and/or south exit only.

13        THE COURT:  So where do you initiate the car stop?

14        THE WITNESS:  Just a short -- you see the green road

15   signs?

16        THE COURT:  Yes.

17        THE WITNESS:  Just after the green road signs,

18   because he was now in the right lane passing vehicles that were

19   on the left, and that's when I decided to make the traffic

20   stop.

21        THE COURT:  Do you stop him -- that's exit number --

22        THE WITNESS:  Should be 3.

23        MR. PERTZ:  We can play a little more and get a

24   clearer picture.

25        THE COURT:  So do you stop him after?

DiRienzo - Direct - Pertz

1          THE WITNESS:  After the sign.  I can show you where.
2          We stopped just in the area of it's called the John
3  Flynn Memorial Bridge.  I think we're like just -- the bridge
4  is in view on the traffic stop.
5          THE COURT:  Okay.
6          (Videotape played)
7          THE WITNESS:  So I'm activating lights in the general
8  vicinity here.  You can see how the traffic is backing up and
9  we stop just before this bridge that we're approaching now,
10 right about here.
11         MR. PERTZ:  If we could pause, please?
12         May the record reflect the witness has indicated that
13 the stop has occurred at approximately 10 minutes and 25
14 seconds.
15         THE COURT:  You pulled him over onto the shoulder?
16         THE WITNESS:  Yes, the right shoulder.  The right
17 shoulder, your Honor.
18         THE COURT:  And that would be just before the Yonkers
19 Avenue exit.
20         THE WITNESS:  Correct.
21         THE COURT:  The exit goes to the right and as you
22 indicated, the Saw Mill River Parkway exit is to the left.
23 There are two lanes there?
24         THE WITNESS:  Correct.
25         MR. PERTZ:  May I have a moment?

DiRienzo - Cross - Gold

1          THE COURT:  You can have two moments.

2          (Pause)

3          MR. PERTZ:  Nothing further, thank you.

4   CROSS-EXAMINATION

5   BY MR. GOLD:

6   Q    Can you hear me all right, Officer DiRienzo?

7   A    Yes, I can.

8   Q    Great.  Thank you.

9          The reason you were following the gray Equinox on March 10

10  was because of the alert system you testified, correct?

11  A    Partially.

12  Q    So you were alerted by that system that the -- who was it,

13  if you know, that had entered into the system that the

14  Chevrolet Equinox was under suspicion for drug trafficking?

15  A    I'm not aware.

16  Q    You don't know where?

17  A    I don't recall who put the alert in.

18  Q    Do you recall what agency?  Like whether it was DEA or

19  Westchester County Police Intelligence Unit?

20  A    I believe it was the Westchester County Police

21  Intelligence Unit.

22  Q    And would your -- is it a computer that tells you about

23  the alerts or your phone?

24  A    Yeah, it pops up.  So mine pops up on the computer.

25  Q    So you have a computer in your --

DiRienzo - Cross - Gold

1   A    In the police car.

2   Q    -- your cruiser?

3   A    Yeah.

4   Q    And it popped up.  Do you remember what it specifically

5   said about the Chevrolet Equinox?

6   A    Specifically, no.

7   Q    What do you remember about that alert?

8   A    That the vehicle was believed to be involved in narcotics

9   trafficking.

10  Q    And when you received that alert, you then -- is it fair

11  to say, you were then looking for that Chevrolet Equinox?

12  A    Yes.

13  Q    And when that Chevrolet Equinox passed you, you noticed

14  it, correct?

15  A    Correct.

16  Q    And you followed it.

17  A    Yes.

18  Q    And you followed it because you had just been alerted that

19  that car was wanted in an investigation about narcotics

20  trafficking; isn't correct?

21  A    And the vehicle and traffic violations, yes.

22          THE COURT:  So did you -- I'm sorry.  Can you

23  clarify.

24          Did the alert say that it was wanted in a narcotics

25  investigation?

DiRienzo - Cross - Gold

1          THE WITNESS:  I'm sorry.  So that's not probably the

2    correct word to use.  It just put in there as it's believed to

3    be involved in a narcotics trafficking.

4          THE COURT:  Narcotics trafficking?  Is suspected.

5          THE WITNESS:  Suspected trafficking activity, yes.

6          THE COURT:  Okay.

7          THE WITNESS:  I don't have access to see what it

8    exactly says right now.

9          THE COURT:  All right.  I just want some clarity.

10         THE WITNESS:  Yes, sir.

11         THE COURT:  The alert didn't say that the vehicle was

12    wanted.

13         THE WITNESS:  Correct.

14         THE COURT:  Okay.

15    BY MR. GOLD:

16    Q    The alert said it was suspected of engaging in narcotics

17    trafficking; is that correct?

18    A    Yes.

19    Q    You were parked on the side of the road when the Chevy

20    Equinox passed you?

21    A    Yes.

22    Q    And you were able to determine that that Chevy Equinox was

23    the same car in the alert?

24    A    Correct.

25    Q    And when you were sitting on the side of the road before

DiRienzo - Cross - Gold

1  you pulled out and followed the Equinox, you had not observed

2  any traffic infractions at that point, correct?

3  A    I did.  That's when the lane violations occurred and after

4  the lane violations occurred, I was pulling out.

5  Q    So you were able to see lane violations before you started

6  moving your car?

7  A    Yes.

8            MR. GOLD:  If I could have one moment, please, your

9  Honor.

10 Q    So you then pull out and you're able to get in close

11 proximity to the Chevy Equinox, correct?

12 A    Correct.

13 Q    And you don't pull it over immediately.

14 A    No.

15 Q    Instead, you pass the Chevrolet Equinox, correct?

16 A    I did, yeah.

17 Q    Then you pulled over at a different location.

18 A    Correct.

19 Q    And when the Chevy Equinox followed you again -- sorry.

20      Then moments, a few minutes -- how long later was it until

21 you saw the Chevrolet Equinox next?

22 A    It was a short time later.  I don't recall how long.

23 Q    How long have you driven -- have you observed the Equinox

24 initially before you passed it?

25 A    From the location of North Columbus Avenue exit?

DiRienzo - Cross - Gold

1   Q    Correct.

2   A    To approximately the Westchester Avenue -- correction,

3   Gramatan Avenue overpass bridge.

4   Q    In time, how long does it take to get from that initial

5   location?

6   A    So it depends on traffic.  That's a heavy traffic area at

7   that time of day.  Maybe a minute, maybe under a minute.

8   Q    So you initially observed the Chevrolet for a minute,

9   maybe under a minute and then you passed it?

10  A    Yeah, because of the traffic.  It got caught in the

11  traffic on the right lane.

12  Q    And how many minutes -- and then you pulled over to the

13  side of the road, correct?

14  A    Correct.

15  Q    And you saw the Chevrolet pass you again.

16  A    Yes.

17  Q    And in part, because it had been flagged as suspicious on

18  your alert system, you decided to follow it again.

19  A    Yes.

20  Q    So at this point you've now -- it's fair to say you

21  followed this vehicle two times because of information you

22  learned -- in part, because of information you learned from the

23  alert system.

24  A    Yes.

25  Q    Part of your job description or part of your job as a

DiRienzo - Cross - Gold

1    Westchester County police officer is to follow leads from that

2    alert system, correct?

3    A     Can you say that one more time?

4    Q     Part of your job as a Westchester County police officer is

5    to follow leads from that alert system, correct?

6    A     Yes.

7    Q     And you're trained to do so.

8    A     Correct.

9    Q     Which means that if a car that's been alerted as

10   suspicious for engaging in drug activity passes you, you're

11   trained to look into that car, follow that car, investigate

12   that car; is that all true?

13   A     Yes.

14   Q     And that's what you did on March 10.

15   A     Yes.

16   Q     Before following the car, you had not spoken to anyone in

17   the Westchester Police Department Intelligence Unit as to why

18   that car had been flagged, correct?

19   A     No.

20   Q     You had not spoken to anyone at the DEA as to why that car

21   had been flagged.

22   A     No.

23   Q     You had not spoken to anyone at Homeland Security as to

24   why that car was flagged.

25   A     No.

DiRienzo - Cross - Gold

1  Q    You do regularly work with the DEA and Homeland Security

2  and the FBI on drug interdiction efforts, correct?

3  A    Yes.

4  Q    That was part of your job on March 10, 2022, correct?

5  A    What part was?  I'm sorry.

6  Q    Following leads about --

7  A    Yes, yes.

8  Q    Do you have a radar gun to measure how fast cars are

9  going?

10 A    I don't have one in my car, no.

11 Q    So you did not -- the only way you determined Mr. Zayas

12 was speeding was through your observations that you testified

13 about a moment ago on direct, correct?

14 A    Yes, through pace radar.

15 Q    After you pulled Mr. Zayas over, do you remember him

16 asking you why you pulled him over?

17 A    Yes.

18 Q    And you did not tell him, hey, I pulled you over for

19 speeding, correct?

20 A    I believe I gave him a couple of the reasons I stopped him

21 for, yes.

22 Q    Right.  So my question is specifically did you tell him,

23 hey, you were speeding?  Or no, did you give him another

24 explanation?

25 A    I don't believe I said speeding only, no.

DiRienzo - Cross - Gold

1    Q    Did you say speeding at all?

2    A    I don't believe I said speeding, no.

3    Q    So you did not tell Mr. Zayas that he had been speeding?

4    A    I don't believe so.

5    Q    Thank you.

6         Is your car equipped with a dashboard camera?

7    A    It is not.

8    Q    Were you wearing a body camera on March 10th?

9    A    Yes.

10   Q    Is that -- was it an Axon model body camera?

11   A    It is, yes.

12   Q    And that was mounted on your chest, correct?

13   A    Correct.

14   Q    And when you turn that camera on, it goes back 30 seconds

15   and basically is able to bring back everything that had

16   occurred within the prior 30 seconds; is that correct?

17   A    Yeah, I think except for audio.

18   Q    Understood.

19        When you activate the Axon body camera, it will sort of

20   retroactively pull up 30 seconds of visual but not audio.

21   A    Yes.

22   Q    Back on March 10th, you activated your body camera when

23   you pulled Mr. Zayas over, correct?

24   A    Maybe when I got out of the car.  I'm not exactly sure

25   when.  After the stop was initiated.

DiRienzo - Cross - Gold

1   Q    Have you ever reviewed that video from your body cam?

2   A    I have.

3   Q    So it's true that since you activated it when you were

4   pulling him over, it actually showed roughly 30 seconds of you

5   driving because of that 30-second time system that we were just

6   talking about, correct?

7   A    I'm not sure.  It would have to depend on when I actually

8   activated it and how much time would have been covered.

9   Q    So you don't recall whether the video showed any of that?

10  A    I know it showed partial driving.  I don't know how long

11  it was off the top of my head, no.

12  Q    So your video, once you turned it on, it was able to show

13  some of the driving.

14  A    It should have, yes.

15  Q    Right.  And you remember that because you saw the video.

16  A    Yes, I think it shows a portion of the driving.  Yes.

17  Q    And since you were wearing it on your chest, the camera

18  was aiming sort of towards your steering wheel and out the

19  front window of your car, correct?

20  A    Correct.

21  Q    It's not hard to turn on your body camera, right?

22  A    No.  Just got to double tap it.

23  Q    So if you had wanted to, you could have activated that

24  camera while you were following Mr. Zayas on the highway,

25  correct?

DiRienzo - Cross - Gold

1   A    I could have.  We don't normally do that, though.

2   Q    And because you never turned that on, we don't have any

3   video of him changing lanes, correct?

4   A    Correct.

5   Q    And we don't have any video of him when you paced him.

6   A    Correct.

7   Q    And we don't have any video showing whether he used or did

8   not use turn signals.

9   A    Correct.

10  Q    Can you remind me, right before you pulled him over, where

11  were you when you observed what you describe as an unsafe lane

12  change?  Or where was -- sorry.  I'll rephrase.

13       Where was Mr. Zayas on the Cross County Parkway when you

14  observed unsafe lane changes?

15  A    He was westbound on the Cross County, just past my

16  location near the North Columbus Avenue exit.

17  Q    And that's close to where the Hutchinson River Parkway

18  branches off with the Cross County Parkway, correct?

19  A    It's after -- yeah, so there's northbound that comes from

20  the City that merges into the Cross County, but that's prior to

21  that location.

22  Q    Understood.

23       And before you pulled him over, one of the reasons you

24  pulled him over was because he passed on the right; was that

25  your testimony?

DiRienzo - Cross - Gold

1   A    Yes, that was one of the violations.

2   Q    Are you familiar with Vehicle and Traffic Law 1123?

3   A    1123, yes.

4   Q    Doesn't -- isn't it true that Vehicle and Traffic Law 1123

5   specifically permits passing on the right if you're on a

6   highway?

7   A    I would have to refer to the law to give you exactly what

8   it says.

9   Q    Do you know under what circumstances Vehicle and Traffic

10  Law 1123 allows cars to pass on the right?

11  A    I believe one is if they're exiting, but I don't, off the

12  top of my head, recall all the reasons.

13  Q    Sitting here today, are you confident that it is against

14  the law to pass someone on the right on a three-way highway?

15  A    In that situation?  Yes.

16  Q    But you don't know what Vehicle and Traffic Law 1123(a)(2)

17  permits?

18  A    Off the top of my head, no.

19       MR. GOLD:  If I could just have a moment, your Honor.

20  Q    Towards the end of the video in the moments before you

21  indicated that you pulled Mr. Zayas over, it's fair to say

22  there are a number of exits on the Cross County Parkway; is

23  that correct?

24  A    In that area?

25  Q    Yes.

DiRienzo - Cross - Gold

1    A    I believe there's three.

2    Q    There's an exit for the Sprain Brook, correct?

3    A    That's before I pulled him over, yes.

4    Q    But not too far before, like we're talking close

5    proximity, correct?

6    A    It's in proximity, yeah.

7         THE COURT:  When you say close proximity, what do you

8    mean by close proximity?  What distance are we talking about?

9         THE WITNESS:  He said close proximity.

10        THE COURT:  All right.  Did you use the word close

11   proximity?

12        THE WITNESS:  Oh, I said proximities.  Probably a

13   mile, over a mile, I think, east of our location.

14        THE COURT:  Okay.  I'm looking for a distance.

15        THE WITNESS:  Yes, I understand.

16   BY MR. GOLD:

17   Q    And then after the Sprain Brook exit, there's the Kimball

18   exit, correct?

19   A    Yes, Kimball slash Midland Avenue.

20   Q    And then there's Midland, correct?

21   A    Yes.  Midland Avenue North and Central South.

22   Q    And then right after that there's -- there's the exit for

23   87 North and 87 South, correct?

24   A    So Midland and Kimball are the same exit, then it's

25   Central Park Avenue northbound, and then southbound.

DiRienzo - Cross - Gold

1    Q    These are all right after each other.

2    A    Yeah, they're close to each other, those are.

3    Q    And you were kinding getting at that, that's why traffic

4    sometimes gets backed up because there are lots of cars going

5    to lots of different exits.

6    A    Yeah, I was speaking specifically for that Bronx River

7    one, but yes.

8    Q    Right.

9         MR. GOLD:  Your Honor, I'm sorry.  Can I have a

10   moment to confer?

11        THE COURT:  You can have two moments.

12        MR. GOLD:  Thank you.

13        THE COURT:  Equal opportunity.

14        (Pause)

15   BY MR. GOLD:

16   Q    Where were you again when you first got the alert about

17   the Chevrolet Equinox on March 10th?

18   A    I was in the lower end of the county in the area of the

19   Cross County Parkway.

20   Q    So you were on the Cross County Parkway, not the

21   Hutchinson?

22   A    I wasn't on the Hutchinson River Parkway.  I was in the

23   area of the Cross County Parkway.

24   Q    Do you recall a phone conversation on March 18, 2022, with

25   Mr. Pertz and Officer Flannagan?

DiRienzo - Cross - Gold

1   A    I do not.

2   Q    Would seeing notes of that meeting -- of that -- would

3   seeing notes --

4            MR. GOLD:  Your Honor, can I show --

5            THE COURT:  Do you want to hand over a document to

6   the witness?

7            MR. GOLD:  Yes, please.

8            THE COURT:  Sure.  You may approach for that purpose.

9            MR. GOLD:  Thanks.

10            THE COURT:  Show it to your adversary first.

11            All right.  The officer is being handed a document.

12            Would you like the officer to read the document, the

13   contents of the document?

14            MR. GOLD:  Yes.

15   Q    If you could read --

16            THE COURT:  All right.

17            Read the contents to yourself.  You cannot read it

18   out loud.

19            (Pause)

20            THE COURT:  Let the attorney know when you're

21   finished.

22   BY MR. GOLD:

23   Q    And I guess I can direct you, Officer DiRienzo.  I'm

24   really just interested in the portions of that conversation

25   that relates to where you were when you received the alert.  So

DiRienzo - Cross - Gold

1    I think that's in the middle of the first page.

2    A    Okay.  I see it.

3    Q    My question is does reading these notes regarding a

4    March 18, 2022, conversation refresh your recollection about

5    that conversation?

6    A    Vaguely, yes.

7    Q    And do you recall during that conversation saying that you

8    were on the Hutchinson River Parkway when you received the

9    alert?

10   A    Yeah.  It notates here that I was on Hutch before the

11   stop.

12   Q    Doesn't it also -- didn't you say during that meeting that

13   when you received the alert, you were on the Hutchinson?

14   A    It doesn't necessary --

15   Q    I'm not asking what it says.  I'm asking whether this

16   reflects your recollection as to this conversation you had in

17   March where you said you were when the alert took place?

18   A    It doesn't actually say -- no, I don't recall that.  No.

19   Q    Was it your testimony earlier you think the Chevrolet

20   Equinox changed lanes abruptly because it had seen you?

21   A    Part of it, yes.

22   Q    And when that occurred, was that the first time you saw it

23   as you pulled out and began -- sorry, as it passed you the

24   first time; is that correct?

25   A    Yes.

DiRienzo - Cross - Gold

1  Q    So it's your belief that the Chevrolet Equinox saw you,

2  recognized you as law enforcement, and then switched lanes for

3  that reason?

4  A    Yes.

5  Q    And that was before you trailed it to determine the speed

6  it was traveling?

7  A    Yes.

8          MR. GOLD:  Thank you.  That's all I have.  Thank you.

9          THE WITNESS:  Do you want this back?

10         MR. GOLD:  Yeah, I'll take it.  Thank you.  I'll come

11 up and get it.

12         THE COURT:  All right.  Do we have any redirect?

13         MR. PERTZ:  No, your Honor.

14         THE COURT:  All right.  Officer, you may step down.

15         THE WITNESS:  Thank you.

16         THE COURT:  Will the government be offering any other

17 witnesses?

18         MR. PERTZ:  No, your Honor.

19         THE WITNESS:  Your Honor, do you want this stuff up

20 here?

21         THE COURT:  You can leave it.  Don't worry about

22 that.  Thank you.

23         (Witness excused)

24         THE COURT:  All right.  Will the defense be

25 presenting any witnesses and/or evidence?

DiRienzo - Cross - Gold

1          MR. GOLD:  Other than stipulations that are mostly

2    worked out, I think there are two small changes.

3          THE COURT:  No one's introduced any stipulations to

4    me.  No signed stipulations or listed exhibits have been

5    admitted into evidence, so if you're going to do that, now's

6    the time to do it.  My understanding the government is

7    basically resting?

8          MR. GOLD:  Yes, they are resting.  I think they have

9    a stipulation that we both need to sign.

10          THE COURT:  Should have been done before you got into

11    the courtroom.

12          MR. GOLD:  What happened --

13          THE COURT:  That's just a secret.

14          MR. GOLD:  Thank you, and I apologize.  I got here

15    right at 10:30 because I was in another courtroom and there

16    were some late changes.

17          THE COURT:  Too much information, as they say.

18          All right.  If you have a stip, what you should be

19    saying is, Judge, give me five minutes so I can speak to

20    co-counsel or to my adversary.  We have a stipulation that we'd

21    like to offer with respect to some exhibits.  We just need to

22    agree on certain language in there, but we hope to have it in

23    five minutes.  Can you give me five minutes.  Try that.

24          MR. GOLD:  Please, can you give me five minutes so we

25    can work out a stipulation.

DiRienzo - Cross - Gold

1           THE COURT:  Sounds like a great idea.  All right.
2      We'll in recess for five to ten minutes.
3           MR. PERTZ:  Thank you, Judge.
4           (Recess)
5           THE COURT:  All right.  We're back on the record.
6           What do the parties have for me?
7           MR. PERTZ:  Judge, at this time, we'd like to hand up
8      a series of stipulations.
9           THE COURT:  Okay.  Hand them up.
10          Do you have a copy, Mr. Pertz?
11          MR. PERTZ:  Yes, we made a note of it.
12          THE COURT:  All right.  So we have a complete record,
13     I assume that they're going to want to order a copy of the
14     transcript, why don't you put the stipulation into the record.
15     Read it into the record.
16          MR. PERTZ:  In that case, may I have that fresh copy
17     back?  That has the --
18          THE COURT:  You should have multiple copies.  I like
19     my own copy.
20          MR. PERTZ:  I was in constructive possession of the
21     copy.
22          THE COURT:  All right.  Just read it into the record.
23     This way you have a complete record and it's just a lot easier.
24     In case there's an appeal, everything is laid out on the
25     record.

DiRienzo - Cross - Gold

1          MR. PERTZ:  Thank you, Judge.

2          It is hereby stipulated and agreed by and among the

3    United States of America by Damian Williams, United States

4    Attorney for the Southern District of New York, T. Josiah

5    Pertz, Assistant United States Attorney of counsel, and David

6    Zayas, the defendant, by and through his attorney, Ben Gold,

7    Esquire, that:

8          One, Government Exhibit 3, GX-3, is a fair and

9    accurate copy of license plate reader data generated on May 10,

10   2022, by license plate readers operated by the Westchester

11   County Department of Public Safety.  GX-3 may be admitted into

12   evidence.

13         Government Exhibit 4, GX-4, fairly and accurately

14   depicts, as plotted on a map from Google Maps, the coordinates

15   of the locations of the two license plate readers listed in

16   GX-3, and the route between the two license plate readers along

17   the Hutchinson River Parkway and Cross County Parkway.  GX-4

18   may be admitted into evidence.  The distance between the two

19   license plate readers referenced in GX-4 is 7.6 miles.

20         Government Exhibit 5, GX-5, is a fair and accurate

21   copy of text messages extracted from the red iPhone seized from

22   the person of David Zayas' incident to arrest on March 10,

23   2022.  These message were dictated and sent using the Siri

24   voice dictation feature.  To face unlock feature was used

25   before the message sent at 2:44 p.m. on March 10, 2022.

DiRienzo - Cross - Gold

1        It is further stipulated and agreed that this

2  stipulation is admissible as a government hearing exhibit,

3  remainder of page intentionally blank.  Dated today, March 22.

4  2023, White Plains, New York.  Signed by myself and Ben Gold.

5        THE COURT:  Okay.  Thank you, counselor.

6        Can I have a copy of the stipulation?

7        MR. PERTZ:  Yes, Judge.  And I am taking a photo now

8  as I should have done before.

9        THE COURT:  All right.  So is it fair to say that the

10  government has rested?

11        MR. PERTZ:  Before the government officially rests,

12  pursuant to this stipulation, the government offers into

13  evidence Government Exhibit 3 and 4, which the government

14  believes is without objection, pursuant to the stipulation.

15        MR. GOLD:  That's correct.  There's no objection

16  regarding 3 and 4.

17        THE COURT:  Okay.

18        MR. PERTZ:  And further, the government offers

19  Government Exhibit 5.

20        MR. GOLD:  And we object to Government Exhibit 5

21  coming in.  I do not believe there are any reasons why this is

22  relevant.  What is in Exhibit 5 is text messages that were sent

23  from a phone that was recovered from Mr. Zayas' automobile, but

24  as stipulated by the government, the text messages sent from

25  Mr. Zayas' phone were sent using Siri dictation.

DiRienzo - Cross - Gold

1          So I think with that in mind, the scope of this

2    hearing, your Honor, was whether Officer DiRienzo had

3    reasonable cause to effectuate a traffic stop on Mr. Zayas.

4          Officer DiRienzo just testified, he did not testify

5    that --

6          THE COURT:  Before you make arguments with respect to

7    why it's not admissible, I'd like to hear from the government

8    the basis for seeking to admit the information contained in

9    Exhibit 5.  Then you can object, all right?  I need to know

10   what the basis is.

11         MR. GOLD:  That's helpful.  Thank you.

12         MR. PERTZ:  Your Honor, this exhibit is impeachment

13   material.  It goes to impeach the defendant's affidavit.  In

14   paragraph 4 of his affidavit submitted with this motion and the

15   reason for this motion is --

16         THE COURT:  Well, the affidavit just gets him, for

17   purposes of the motion, got him the hearing.  All right?  And

18   then the hearing is to determine whether or not there is a

19   legal basis for the stop.  And the only person that testified

20   was the officer.

21         MR. PERTZ:  If the affidavit is not evidence, then

22   the government does not need to impeach it, that's correct.  I

23   was under the impression that the affidavit was offered even in

24   hearsay form as --

25         THE COURT:  I haven't heard any testimony nor any

DiRienzo - Cross - Gold

1    testimony presented by whatever document or declaration.

2    Nothing has been offered except for the testimony of the

3    officer at this hearing.

4            MR. PERTZ:  In that case, the text messages are

5    weakly associated only with the officer's testimony and under

6    that set of facts and reality, the government does not need to

7    offer Exhibit 5.

8            THE COURT:  All right.  Thank you, counselor.

9            MR. GOLD:  I guess there's no reason for me to say

10   anything.  Thank you, your Honor.

11           THE COURT:  See how things work?  Just follow the

12   standard procedures and let them make an offer of proof first,

13   what the basis is, then you can make your objection.

14           All right.  So is the government resting at this

15   time?

16           MR. PERTZ:  Yes, your Honor.  The government rests.

17           THE COURT:  Okay.  All right.

18           The government is resting with respect to the

19   hearing, they're not going to be introducing any additional

20   witnesses.  I take it the parties want to make the equivalent

21   of a closing remark; is that correct?

22           MR. PERTZ:  Yes, your Honor.

23           THE COURT:  The exhibits that were introduced into

24   evidence by virtue of the stipulation are without any objection

25   is Government Exhibit 3 and Government Exhibit 4, and the

DiRienzo - Cross - Gold

1   government withdrew on Government Exhibit 5 from consideration.

2   So it wasn't received into evidence.

3           Exhibit 3 and 4 are now deemed marked in evidence.

4           (Government's Exhibit 3 and 4 received in

5                   evidence)

6           THE COURT:  All right.  Who wants to address the

7   Court first?

8           MR. PERTZ:  The government would like to address the

9   Court.

10          THE COURT:  All right.  You can remain seated.  It's

11  just a lot easier this way.

12          MR. PERTZ:  The government's burden here is to show

13  by a preponderance of the evidence that the traffic stop had a

14  basis in law that the officer who pulled over defendant David

15  Zayas' car on March 10, 2022, did so with reasonable suspicion.

16  The government has met that burden through sworn testimony.

17          Officer DiRienzo testified that on March 10, 2022, at

18  approximately 2:42 p.m. he received -- after receiving an alert

19  he observed a vehicle, later found to be driven by the

20  defendant, David Zayas, on the Cross County Parkway.  The

21  officer observed a traffic violation in the form of an unsafe

22  lane change and a lane change conducted without signaling.

23          The officer followed Zayas' car for a distance,

24  overtook the car, pulled over again, saw Zayas' car pass him a

25  second time, and the second time the officer pulled out,

DiRienzo - Cross - Gold

1    followed Zayas' car and paced him.

2            In pacing the car, Officer DiRienzo saw that his own

3    speed was approximately 63 miles per hour and he was not

4    gaining or losing distance from Zayas' car.  Accordingly, the

5    officer concluded that Zayas' car was going 63 miles per hour.

6    The officer also testified that at this point on the highway

7    the speed limit was 45.  Accordingly, Zayas was speeding.

8            The officer then pulled over the car after having

9    witnessed these traffic violations.  The officer wrote a report

10   memorializing these violations, which he began shortly after

11   the stop.

12           The officer subjected himself to cross-examination,

13   and while his memory was not perfect, his testimony held up.

14   He did not recant any of the substantial facts that he provided

15   in support of his memory that the defendant had both sped and

16   committed other traffic violations.

17           In short, the government has met its burden through

18   testimony and while it would have been nice to have a camera

19   recording every moment of the traffic stop and the minutes that

20   preceded it, what we have is sufficient legally for the Court

21   to find that the government has met its burden.

22           Unless the Court has any questions, the government

23   will rest on that.

24           THE COURT:  No, I don't have any questions for you at

25   this time, counselor.  Thank you.

DiRienzo - Cross - Gold

1          Mr. Gold.

2          MR. GOLD:  Thank you, your Honor.

3          As we argued in our underlining brief, the seizure of

4     Mr. Zayas was unlawful.  Certainly, I concede that Officer

5     DiRienzo came in today and testified that Mr. Zayas was

6     speeding and that he changed lanes in an unsafe way.  But I

7     submit, even despite his testimony, the government has failed

8     to meet their burden.  In this case, it is absolutely their

9     burden to show that this warrantless intrusion on Mr. Zayas'

10    travels was justified.

11         Regarding the allegation that he was speeding, the

12    only -- the government is resting on the words of Officer

13    DiRienzo, but his words, especially in conjunction with the

14    other evidence that's before the Court, specifically, the

15    contents of Exhibit 3 and 4, his testimony that Mr. Zayas is

16    speeding is very suspect and is not credible, certainly not

17    credible to the extent where the government meets their burden.

18         THE COURT:  I'm sorry.  I'm going to interrupt you.

19    You just made a statement.  Exhibit 3 and 4 you say seems to

20    undermine credibility of the witness.  The question that I have

21    and must follow is how so?

22         Exhibit 4 is a road map of sorts that basically shows

23    where the two license recognition cameras are located.  It

24    purports to show the area that the vehicle traveled.  And

25    that's all it is.  Exhibit 4 is just merely a road map.

DiRienzo - Cross - Gold

1          And Exhibit 3, it basically just contains data.

2    There's a reference to the camera identification and the

3    license plates that it detected.  But I'm not quite sure how

4    that undermines the testimony of the officer as you indicated.

5          MR. GOLD:  Correct.  And I hadn't -- I was about to

6    get there, and I will explain why I believe the stipulations,

7    combined with these two exhibits, undermine the officer's

8    testimony today.

9          Turning to Government Exhibit 3, the license plate

10   reader data.  It shows, I believe it's on page 2 of 5, if your

11   Honor has the same five-page exhibit as I have, it shows that

12   Mr. Zayas' car was first spotted by the first license plate

13   reader at 1450 -- sorry, at 1442 with 12 seconds.  So that's

14   2:42 and 12 seconds.

15         It then shows that the second license plate reader

16   saw Mr. Zayas' automobile nine minutes later, at 14:51:27.  As

17   spelled out in the stipulation, the parties agree that the

18   distance between these two license plate readers is 7.6 miles.

19         So here's what we know.  We know from Exhibit 4 and

20   the stipulation that -- and the license plate reader data in

21   Exhibit 3, that it took Mr. Zayas 9 minutes and 12 seconds to

22   travel 7.6 miles, as shown in Government Exhibit 4.  And while

23   that does not give you a real time speed at any particular

24   moment, it gives you an average speed of 49.6 miles per hour.

25         That is what is demonstrably provable with the --

DiRienzo - Cross - Gold

1    with the LPR information, which cannot be disputed.

2              And so the license plate reader --

3              THE COURT:  Did you ask the officer about the speed

4    that the cars were traveling at any given moment?

5              MR. GOLD:  I asked generally about his speeding and I

6    concede that I --

7              THE COURT:  The only time that the officer testified

8    with respect to speed was when he was, for lack of a better

9    term, trailing the defendant's vehicle, correct?

10             MR. GOLD:  Correct, and the reason --

11             THE COURT:  And that was for a short distance; wasn't

12   that the testimony?

13             MR. GOLD:  He said it was for roughly a mile and it

14   was from --

15             THE COURT:  For roughly a mile.  He indicated

16   63 miles per hour.

17             He also testified with respect to that being a

18   heavily traveled area.  Other than that, at no moment was there

19   anything, any testimony proffered with respect to any speed

20   limits, whether it be from the Hutchinson River Parkway where

21   the first camera is purportedly located, to any other time when

22   the officer is not trailing your client's vehicle.  Fair

23   enough?

24             There's no testimony with respect to any speed of

25   traveling or anything like that, correct?

DiRienzo - Cross - Gold

1          MR. GOLD:  Correct.

2          THE COURT:  So you're asking me to assume, make

3     certain assumptions, that they were traveling -- that your

4     client's vehicle was traveling approximately 49 miles per hour,

5     correct?  Absent any other testimony.

6          MR. GOLD:  It's slightly different.  I'm asking you

7     to compare the, I believe, not credible testimony of Officer --

8     of the officer that was very conclusory in nature.

9          You're right, it was not specific.  It did not say,

10    oh, he was going a certain -- he did not say what the speed

11    limit was or where the speed limits changed.  You make a very

12    good point.  And juxtaposing that, so that the conclusory

13    testimony --

14         THE COURT:  Well, the only relevant testimony with

15    respect to speed comes with respect to the issue of whether or

16    not your client committed an infraction of the law; fair

17    enough?

18         MR. GOLD:  Fair enough.

19         And that's yet another reason why the government

20    hasn't met their burden.

21         Sorry, I think I've gone out of order here.

22         There are many reasons why the government has not

23    made their burden.  Turning to speeding first.  I think there

24    are many reasons they cannot meet their burden with speeding.

25         First, as your Honor just pointed out, there was not

DiRienzo - Cross - Gold

1    sufficient -- there was not any testimony regarding what the

2    speed limits actually were, just a conclusory statement that he

3    was speeding.  That conclusory statement --

4             THE COURT:  That's not what I heard.  I heard it's a

5    40-mile an hour zone, that he testified to, and I heard that

6    once he started following your client's vehicle again, at that

7    point, your client is traveling at a rate of 63 miles an hour,

8    and the reason why he knows that, the officer knows that, is

9    because he was trailing him, keeping pace at the same rate of

10   speed.

11            How is that conclusory?  Those are facts.

12            MR. GOLD:  What's conclusory is -- that's fair.  I

13   will withdraw the word conclusory.

14            But what is important here, your Honor, is the

15   officer is saying that Mr. Zayas, who was apparently so worried

16   about the officer's presence, if you believe this officer, that

17   he swerved, would then speed 15 miles per hour over the speed

18   limit for a protracted period of time while he was being

19   followed by that same officer who he was worried about.

20            THE COURT:  Well, let's go back to that testimony

21   with respect to what he believed your client's mental state of

22   mind is.  That's an assumption, right?  I don't even think

23   that's relevant what your client was thinking, because the

24   officer has no way of knowing what your client was thinking, or

25   why he moved, or why he changed lanes.  There's an assumption

DiRienzo - Cross - Gold

1  that's made there, that the officer makes.

2          MR. GOLD:  And I think the assumption tells wonders

3  and diminishes this officers' credibility because, first, the

4  assumption seems wrong.  Second, the assumption just doesn't

5  make sense that someone would be so worried about law

6  enforcement, that they effectively swerve, that's what he was

7  saying, to avoid the officer and make an unsafe change.  But

8  then would be so cavalier about an officer trailing them for a

9  minute, that they speed up and continue to speed for over a

10 minute.

11         That, your Honor, I do not believe is worthy of

12 belief, especially where we have license plate reader data

13 which show that on average between two points, he was going,

14 Mr. Zayas was going below the speed limit.

15         THE COURT:  What was the speed limit?

16         MR. GOLD:  The speed limit changed.  If you look at

17 the video that introduced --

18         THE COURT:  With all due respect, what was the speed

19 limit?  What testimony was proffered with respect to the speed

20 limit at certain points in the parkway?

21         MR. GOLD:  I believe --

22         THE COURT:  The only -- as I said, and I'm repeating

23 myself -- that the only time there's testimony proffered was on

24 direct evidence with respect to the moment when the officer

25 picks up a second -- the second time when he observes your

DiRienzo - Cross - Gold

1   client's vehicle and follows him near the Yonkers Avenue exit

2   and pulls him over.  And he says I'm trailing the vehicle.  In

3   essence, he testifies that he's trailing the vehicle, your

4   client is driving 63 miles an hour, and the speed zone in that

5   area -- that's what I heard, if I'm mistaken, let me know --

6   was 45 miles an hour.

7           MR. GOLD:  That's true.  I think what's also in

8   evidence, although not through this witness, but I think what

9   is also in evidence through the video of the route which the

10  witness said fairly and accurately displayed the road

11  conditions --

12          THE COURT:  I saw that and this 40 miles an hour is a

13  sign that I saw twice.  Even at your rate, which is 49 miles an

14  hour, your client is speeding; is he not?

15          MR. GOLD:  He's not, because at Webster Avenue, which

16  on Government's Exhibit B is roughly halfway in between, there

17  is a speed limit 50-mile per hour sign that is visible.  There

18  are several.

19          THE COURT:  Did this officer testify that he saw him

20  speeding or speeding over by the Webster Avenue exit?

21          MR. GOLD:  No, I'm just saying --

22          THE COURT:  Listen, if you're going to make certain

23  statements, you have to be able to support it, either by some

24  piece of evidence or testimony, right?  Testimony being oral

25  evidence, right?

DiRienzo - Cross - Gold

1          Your argument to me that your client was not speeding

2   at any given time, that the officer's testimony is not credible

3   because, number one, the distance between the two cameras is

4   approximately 7 plus miles, slightly over 7 miles, and in order

5   for him to get from one camera to the other he must have --

6   this is the argument you're making -- he must have been

7   traveling at a rate of 49 miles an hour.  That's your argument?

8          MR. GOLD:  That's part of the argument.

9          THE COURT:  Okay, if that's so, how do you make that

10  argument absent any direct testimony that that's the rate of

11  speed that he was traveling at any given time without taking

12  into account all the other factors that was presented, meaning

13  that there was a heavily traveled area and that there's

14  traffic?

15         MR. GOLD:  Because it is not believable that someone

16  would drive an average of 49 miles per hour and then speed up

17  when they're being trailed by a police officer, especially

18  where that police officer testifies that they think the

19  individual is nervous about the police officer's own presence.

20  It just does not make sense.

21         Also, the officer testified he could have pushed a

22  button on his camera system which would have allowed the

23  trailing to be observed.  It is the government's burden.

24         When the government intentionally chooses not to turn

25  on a camera, your Honor, that's something the Court can

DiRienzo - Cross - Gold

1  consider and their failure to do so, I think, further casts
2  doubt on the officer's testimony.
3          The officer -- also, and I'll just very quickly talk
4  about the speed limit signs, that the exhibit showing the video
5  routes that the officer testified about and that your Honor
6  saw, does show that the speed limit is not --
7          THE COURT:  Can you put the video on?  Can you put
8  the video on for the Court one more time, from start to finish?
9          But it's fair to say that would only address the
10  issue of speeding.  It doesn't necessarily address the issue of
11  unsafe lane changes and the failure to signal; is that fair?
12          MR. GOLD:  Correct.  I will talk briefly about those
13  as well, but I began with speeding because -- I began with
14  speeding because I think that is something they have not been
15  able to prove.
16          THE COURT:  Can you play from the very beginning to
17  the end?
18          How many minutes is this video?
19          MR. GOLD:  I believe it's slightly more than 10
20  minutes.
21          MR. PERTZ:  And if your Honor would like to speed up
22  the process, we could jump to 7:13 in the video, which is where
23  the officer first sees --
24          THE COURT:  Go to 7:13 when the officer first sees.
25          MR. GOLD:  I actually am not sure that solves the

DiRienzo - Cross - Gold

1    analysis since what we're talking about is the distance

2    between --

3              THE COURT:  The relevant inquiry is what the officer

4    observed; is it not?

5              MR. GOLD:  But whether it's credible that he observed

6    speeding can be analyzed by figuring out the speed between two

7    distances.

8              THE COURT:  7:13, let's start there.

9              The record should reflect the video is being shown as

10   of 7:13.

11             (Videotape played)

12             THE COURT:  45 miles an hour, there's a speed limit

13   sign.  First speed limit sign that I see is 45 miles an hour.

14             There's a speed limit for an exit, which is 30 miles

15   an hour.

16             45-mile an hour limit sign at this juncture of the

17   video.  I don't know what the timestamp is, but it's not

18   relevant.

19             There's a speed limit for the exit, however, the

20   testimony is that your client or the defendant was still on the

21   road and had not exited yet.  The vehicle stop did not occur at

22   an exit sign or at an exit.

23             Another exit speed limit which is not relevant.

24             Another speed limit that's for an exit.  Okay.

25             And there's a 45-mile an hour speed limit sign at

DiRienzo - Cross - Gold

 1    this juncture just before the stop.  Just before the Yonkers
 2    Avenue exit.
 3            Can you stop the video at this time because I believe
 4    there's another.  There's another speed limit sign.  It's out
 5    of focus.
 6            Continue, please.
 7            (Videotape played)
 8            THE COURT:  And this is the area -- is this the area
 9    where the car stop takes place before the Yonkers exit?
10            MR. PERTZ:  That's right, I think we continued past.
11            THE COURT:  All right, we can stop.  All right.
12            So the only signs I saw in the video was that of
13    45-mile an hour speed limit.
14            MR. GOLD:  So my concern is we did not -- we did not
15    watch the first seven minutes and I know that there are --
16            THE COURT:  Counselor, it's not relevant, with all
17    due respect.  The question is whether or not what observations
18    this officer made, right, such that the actual car stop was a
19    valid basis for pulling the defendant over.  That was the
20    inquiry that I defined with respect to my ruling.
21            MR. GOLD:  I don't disagree with that.  I don't think
22    I'm making my point well which is that in the beginning of the
23    video --
24            THE COURT:  Counselor, it's what the officer observed
25    such that there was a lawful basis for the car stop.  Is that

DiRienzo - Cross - Gold

1    not the level of inquiry that I outlined in my opinion?

2              MR. GOLD:  It's precisely the level of inquiry in

3    your opinion, you are correct.

4              THE COURT:  I'll allow you to make your arguments.

5              MR. GOLD:  I'll be brief.

6              THE COURT:  You can as long as you want.

7              MR. GOLD:  My point is that the video shows that at

8    earlier points on the Hutchinson River Parkway, which is in

9    between the two LPR readers, the speed limit is 50 and toward

10   the northern part is 55.

11             The reason that is relevant is not because it proves

12   conclusively how fast Mr. Zayas was driving at any particular

13   time, I concede it does not, but the reason why it is relevant

14   is because averaging Mr. Zayas' speed over a course of roads

15   where the speed limit varies from 45 to 55, and when you

16   average his speed and the speed results in a speed limit -- in

17   a speed of roughly 50 or 49 miles per hour, conjuncting that or

18   joining that with the allegation that for roughly a mile or a

19   significant period of time he was going 15 miles per hour at a

20   time when he was worried about a police officer behind him, is

21   just not credible.

22             So I'm only pointing this out to give your Honor the

23   reason why I believe the government cannot meet their burden

24   regarding speed.

25             Similarly, I do not think the government can meet

DiRienzo - Cross - Gold

1  their burden regarding improper lane changes.  Yes, Officer

2  DiRienzo said that Mr. Zayas did not signal properly and that

3  he passed on the right, but he also admitted he wasn't exactly

4  familiar with the statute that permits passing on the right.

5  He also admitted that he could have easily turned on a camera

6  that would have shown Mr. Zayas' driving as he trailed the car

7  and he chose not to.

8        It's also telling that he did not, when Mr. Zayas was

9  pulled over, tell Mr. Zayas that he had been speeding and it's

10  also telling that he says that he observed these traffic

11  infractions but that he did not immediately pull Mr. Zayas

12  over, instead he passed him.  In cumulative, while he did say

13  that Mr. Zayas committed traffic infractions, I think when you

14  examine what he said in light of the stipulations and common

15  sense, that the government has failed to meet their burden and

16  that therefore it was improper for Mr. Zayas to be pulled over,

17  and because the scope of this is limited to whether he was

18  properly pulled over, I will not go into the other arguments.

19        THE COURT:  What's the standard of proof for purposes

20  of this hearing?

21        MR. GOLD:  The government has the burden to prove

22  that Officer DiRienzo acted properly.

23        It is by preponderance -- I'm sorry.  It's by -- they

24  need to prove that there was reasonable suspicion.

25        THE COURT:  But what's the standard of proof that

DiRienzo - Cross - Gold

1    they have to make that showing by?  I believe it's

2    preponderance of the evidence, counselor.

3              MR. GOLD:  Sorry, I -- I'm just looking at my notes

4    because I have this and the case law, but, yes, it is

5    preponderance.

6              THE COURT:  Is there anything further that you'd like

7    to say or argue?

8              MR. GOLD:  No.  Thank you, your Honor.

9              THE COURT:  Anything further from the government?

10             MR. PERTZ:  No.  Thank you, your Honor.

11             THE COURT:  All right.  Having considered all the

12   evidence, I find the police officer's testimony credible.  I

13   find that the government has met its burden by demonstrating by

14   a preponderance of the evidence that Officer DiRienzo observed

15   the vehicle in the vicinity of the Cross County Parkway

16   traveling westbound and that he received an alert which

17   permitted him to focus on the vehicle, which was the basis for

18   merely targeting the vehicle, that upon targeting the vehicle

19   he then followed or observed the vehicle, observed the vehicle

20   engage in multiple traffic infractions, one being unsafe lane

21   changes, a failure to signal when changing lanes.  There's also

22   testimony with respect to observing the defendant's vehicle, an

23   Equinox, speeding above the speed limit which, according to

24   testimony, was 40 miles an hour.

25             Based on the Court's review of the video which was in

DiRienzo - Cross - Gold

1   evidence, there are multiple speed limit signs visible in the

2   video that indicates that the actual speed limit on that

3   parkway in a westbound direction is 45 miles an hour.

4          He also testified that he followed the vehicle at a

5   rate of 63 miles an hour, 63 miles per hour, and determined

6   that it was speeding above the permissible speed limit on that

7   roadway such there's evidence to demonstrate that the officer

8   had a reasonable suspicion, a lawful basis, for pulling over

9   the defendant's vehicle after seeing the vehicle engage in

10  multiple traffic infractions.

11         And there's been no evidence proffered to contradict

12  the credible testimony of the officer.

13         That's my ruling.  All right.

14         Is there anything further?

15         MR. PERTZ:  Nothing from the government.  Thank you,

16  your Honor.

17         THE COURT:  All right.  Anything further?

18         MR. GOLD:  No.  Thank you, your Honor.

19         THE COURT:  All right.  Mr. Gold, your objections are

20  duly noted on the record.

21         All right.  Gina, off the record.

22         (Discussion off the record)

23         THE COURT:  With respect to the actual stipulation

24  that contains the agreement between the parties, the actual

25  stipulation will be deemed marked in evidence as Government

DiRienzo - Cross - Gold

1    Exhibit 6.

2              (Government's Exhibit 6 received in

3                   evidence)

4              THE COURT:  I do have a question.

5              Mr. Gold, you filed a motion on behalf of your client

6    with respect to the -- I'm sorry, I'm losing my thought

7    train -- with respect to the license recognition system and the

8    information that was extracted from it; how is that relevant?

9              Why should the Court consider that motion and why

10   should the Court not consider the motion moot in light of the

11   fact its made a determination that there was reasonable

12   suspicions to pull over the vehicle based on a traffic

13   infraction?

14             MR. GOLD:  Your Honor, I'm happy to speak to that.  I

15   know you typically do not like multiple attorneys talking, but

16   I wonder if Mr. Thaxter, who's helped me a tremendous amount

17   with the license plate issue, if you'd let him address your

18   Honor also.  I can briefly answer that question, but I know

19   he'll want, or I suspect he'd want to add to my brief answer.

20             THE COURT:  You can give him the microphone.

21             MR. GOLD:  Okay.

22             MR. THAXTER:  Thank you, your Honor.  So there's two

23   issues actually.  So one is that the government has said that

24   they want to actually introduce the ALPR records on their case

25   in chief, and the second is that your decision based on the

DiRienzo - Cross - Gold

1   extension of the stop and the government's position is that the

2   ALPR records are relevant or were a part of the consideration

3   and the reasons to --

4          THE COURT:  The officer testified that that was the

5   basis for him looking for the vehicle and ultimately following

6   it.  And he did testify that that was part of the basis for the

7   stop; however, in my decision, I indicated that that was not a

8   relevant factor with respect to whether or not there was

9   reasonable suspicion for the actual car stop.

10         MR. THAXTER:  Right.  What I'm saying is, to the

11  extension of the car stop in utilizing the narcotics detecting

12  dog and interrogating Mr. Zayas.

13         THE COURT:  That has -- with all due respect, all

14  things that flowed afterwards, right, and I've addressed those

15  issues.  You're seeking to deem a piece of evidence that I

16  found irrelevant to the analysis, to my analysis to whether or

17  not there was a lawful stop here.

18         MR. THAXTER:  So your Honor, as to your decision on

19  page 20, and this is the same -- this is the arguments that the

20  government made -- is that while it may not -- the ALPR records

21  in that investigation may not have been enough on their own to

22  establish a reasonable suspicion for a stop, the Court finds

23  that reasonable suspicion is reached when the facts gathered by

24  the WCP investigation is paired along with the nervous behavior

25  observed by Officer DiRienzo.

DiRienzo - Cross - Gold

1          So what I'm saying is that that was a factor that was

2    considered in the extension of the stop, and again, it is --

3    this is direct evidence that the government intends to

4    introduce in their case in chief.

5          So there are two reasons why this decision today does

6    not moot the motion.

7          THE COURT:  You're reading from the last paragraph?

8          MR. THAXTER:  The last paragraph on page 20.

9          THE COURT:  You can file the motion.  I still don't

10   see how it's relevant, with all due respect, because if I find

11   there's a reasonable basis for the stop by virtue of the

12   traffic infractions and that's enough, the fact that they may

13   have had other information that made the officer look out for

14   the vehicle, it really doesn't matter, as long as there's a

15   lawful basis for the stop.  That's the determination I'm making

16   here.  What you're trying to do is trying to back end that

17   decision.

18         MR. THAXTER:  Well, I just want to be clear it is

19   the -- that is based on the testimony of the -- or the

20   statements of the officer --

21         THE COURT:  I understand that.  The officer said that

22   this license recognition program alerts them to certain types

23   of vehicles.  I get that.  But my determination is that based

24   on the observations of the traffic infractions, that that in

25   and of itself is a sufficient basis upon which reasonable

DiRienzo - Cross - Gold

1     suspicion for the stop was achieved.

2          MR. THAXTER:  So I understand your Honor's decision

3     today, and I agree that as to the stop itself, at this point in

4     time, the stop has been decided, but we are also talking about

5     an extension of the stop and the use of the drug-sniffing K9,

6     which both the government's position as well as --

7          THE COURT:  Your motion, I thought your motion was

8     limited to excluding the license recognition information that

9     was provided to the officer.

10          MR. THAXTER:  So it is both.  To the extent that the

11    government wants to use in their case in chief the ALPR

12    records, the motion argues that they should be suppressed;

13    however, to the extent that also the contraband that was

14    recovered is the fruits of the extension of this stop, right?

15    Even if the stop is considered valid, which your Honor has

16    decided, there is an issue of whether they can extend the stop

17    for the purposes of interrogating Mr. Zayas about his

18    whereabouts and using the drug-sniffing dog.

19          Your Honor and the government both, the government

20    made the argument that part of the basis to extend the stop was

21    the ALPR records and the subsequent investigation.  Your Honor

22    agreed with them, to the extent that it was relevant, but

23    disagreed, and I think rightly so, in finding that the ALPR

24    records in that investigation on their own were not sufficient

25    for the stop or the extension of the stop.

DiRienzo - Cross - Gold

1          THE COURT:  Again, it appears to me you're trying to

2   back end the basis for the search.  My ruling is that the

3   actual vehicle infractions were the basis for the ultimate

4   stop, which ultimately resulted in the use of the K9 and a

5   finding of the contraband.  You're now trying to make an end

6   run of that by saying that because this license recognition

7   prompted the initial -- the officer to initially identify your

8   client's vehicle, that everything that flowed from there is now

9   the fruit of the poisonous tree.

10          That's your argument; is it not?

11          MR. THAXTER:  So I want to make sure I fully

12   understand your Honor's question, because I don't want to go

13   around in circles.  I think I've -- there are multiple sort of

14   points that we are raising, right?

15          THE COURT:  My question is this.  If I exclude that

16   fact or the fact that there's a system involved that alerted

17   the officer to the vehicle, what that information was, there's

18   still a basis for the stop, i.e., the traffic infractions,

19   which ultimately resulted in the recovery of the contraband.

20          MR. THAXTER:  Right.  And there is a second legal

21   issue that arises after the stop, correct?

22          There is the issue of the extension of the stop and

23   the actions taken after the stop for speeding and illegal lane

24   changes, right?  So that has its own separate legal analysis

25   which the government argued part of the reason to extend the

DiRienzo - Cross - Gold

1    stop was the ALPR records, and your Honor decided, again, I
2    think rightly, that the ALPR records on their own were not a
3    sufficient basis to extend the stop; however, they were in
4    combination with the observations of the officer.
5             THE COURT:  So it's the defendant's position that the
6    basis for the actual investigation into narcotics was prompted
7    by the license system, the alert system?
8             MR. THAXTER:  I actually think that is conceded by
9    the government.  Prior to the ALPR analysis, the government had
10   no reason to suspect Mr. Zayas of anything, let alone any
11   particular citizen of anything.  This was an analysis and
12   search that was conducted across all individuals traveling
13   through Westchester County over a period of two years.
14            So they have conceded in their papers that that is
15   the case.
16            THE COURT:  All right.  Let's see what the motion
17   says.  I'll see what we determine.  All right?
18            Did I set a briefing schedule for that?  For the
19   motion?
20            MR. PERTZ:  Yes.
21            THE COURT:  Okay.  This is off the record.
22            (Discussion off the record)
23            THE COURT:  Let's go back on the record.  I know that
24   there's still motion practice that needs to be addressed.  The
25   Court has already set a briefing schedule.

DiRienzo - Cross - Gold

1        So I'm putting this over to June 9th, 2023, at

2   10:00 a.m., and Mr. Gold has indicated that his client is

3   willing to consent to have this matter -- have this conference,

4   or rather to appear remotely; however, in the event that the

5   Court is going to take oral argument on any aspect of the

6   motion, his client would prefer to have an in-person conference

7   for that purpose.

8        MR. GOLD:  Yes.  Thank you, your Honor.

9        THE COURT:  All right.  So we'll schedule it for --

10  the next conference date is scheduled for June 9, 2023,

11  10:00 a.m., and that's remote with the consent of the

12  defendant.  And in the event the Court needs oral argument on

13  any aspect of the motion, we'll reschedule it for an in-person

14  conference.  It may not be that date, but we'll try to keep it

15  as close as possible to that date.

16       All right.  Are there any other matters that the

17  parties want to put on the record?

18       MR. PERTZ:  No, your Honor.

19       MR. GOLD:  No.  Thank you.

20       THE COURT:  What are we doing with the time between

21  now and the next conference date?

22       MR. PERTZ:  The government moves to exclude time

23  under the Speedy Trial Act.  The government submits that the

24  time between today and June 9th, 2023, should be excluded in

25  the interest of justice as there are motions pending.

DiRienzo - Cross - Gold

1          MR. GOLD:  No objection.

2          THE COURT:  All right.  So the Court will exclude

3   time from today through June 9, 2023.  Exclusion of such time

4   outweighs the best interest of the public and the defendant in

5   a speedy trial, in order to allow motion practice, inasmuch as

6   the Court has set a briefing schedule for defendant's pending

7   motion.

8          Anything else?

9          MR. PERTZ:  Nothing else.  Thank you.

10          MR. GOLD:  No.  Thank you, your Honor.

11          THE COURT:  All right.  Thank you.

12          Gina, there being nothing further, we can recess.

13          THE DEPUTY CLERK:  Court in recess.

14          Thank you, everyone.

15                          o0o

16

17

18

19

20

21

22

23

24

25

```
1

2                    INDEX OF EXAMINATION

3     Examination of:                        Page

4     DAVID DiRIENZO

5     Direct by Mr. Pertz . . . . . . . . . . . 3

6     Cross by Mr. Gold . . . . . . . . . . . .28

7

8                    GOVERNMENT EXHIBITS

9     Exhibit No.                        Received

10    3 and 4  . . . . . . . . . . . . . . . . .50

11    6  . . . . . . . . . . . . . . . . . . . .67

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```